Slip Op. 21-146

# UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| SEAH STEEL CORPORATION, | |
|     Plaintiff, | |
| v. | |
| UNITED STATES, | |
|     Defendant, | **Before:  Jennifer Choe-Groves, Judge** |
| and | **Court No. 20-00150** |
| UNITED STATES STEEL CORPORATION, MAVERICK TUBE CORPORATION, IPSCO TUBULARS INC., TENARIS BAY CITY, INC., and VALLOUREC STAR L.P., | |
|     Defendant-Intervenors. | |

## <u>OPINION AND ORDER</u>

[Sustaining in part and remanding in part the U.S. Department of Commerce's final results in the 2017–2018 administrative review of the antidumping duty order on oil country tubular goods from the Republic of Korea.]

Dated:  October 19, 2021

<u>Jeffrey M. Winton</u>, <u>Michael J. Chapman</u>, <u>Amrietha Nellan</u>, and <u>Vi N. Mai</u>, Winton & Chapman PLLC, of Washington, D.C., for Plaintiff SeAH Steel Corporation.

<u>Hardeep K. Josan</u>, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of New York, N.Y., for Defendant United States.

With her on the brief were <u>Brian M. Boynton</u>, Acting Assistant Attorney General, <u>Jeanne E. Davidson</u>, Director, and <u>Claudia Burke</u>, Assistant Director.  Of counsel on the brief was <u>Mykhaylo Gryzlov</u>, Senior Counsel, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, D.C.

<u>Thomas M. Beline</u>, <u>Myles S. Getlan</u>, <u>James E. Ransdell</u>, and <u>Nicole Brunda</u>, Cassidy Levy Kent (USA) LLP, of Washington, D.C., for Defendant-Intervenor United States Steel Corporation.

<u>Gregory J. Spak</u>, <u>Frank J. Schweitzer</u>, <u>Kristina Zissis</u>, and <u>Matthew W. Solomon</u>, White & Case LLP, of Washington, D.C., for Defendant-Intervenors Maverick Tube Corporation, IPSCO Tubulars Inc., and Tenaris Bay City, Inc.

Choe-Groves, Judge:  Plaintiff SeAH Steel Corporation ("SeAH" or

"Plaintiff") filed this action challenging the final results published by the U.S.

Department of Commerce ("Commerce") in the 2017–2018 administrative review

of the antidumping duty order on oil country tubular goods ("OCTG") from the

Republic of Korea ("Korea").  <u>See</u> <u>Certain Oil Country Tubular Goods from the</u>

<u>Republic of Korea</u> ("<u>Final Results</u>"), 85 Fed. Reg. 41,949 (Dep't of Commerce

July 13, 2020) (final results of antidumping duty administrative review; 2017–

2018); <u>see also</u> Issues and Decision Mem. for the Final Results of the 2017–2018

Admin. Review of the Antidumping Duty Order on Certain Oil Country Tubular

Goods from the Republic of Korea (July 6, 2020) ("Final IDM"), ECF No. 20-5.

Before the Court is the Motion of Plaintiff SeAH Steel Corporation for Judgment

on the Agency Record, ECF Nos. 43, 44.  <u>See also</u> Br. SeAH Steel Corp. Supp. Its

Rule 56.2 Mot. J. Agency R. ("SeAH's Br."), ECF Nos. 43-1, 44-1.  For the

following reasons, the Court sustains in part and remands in part the Final Results.

## ISSUES PRESENTED

The Court reviews the following issues:

1.  Whether Commerce's application of a differential pricing analysis in
    calculating SeAH's dumping margin is in accordance with the law;

2.  Whether Commerce's determination that a particular market situation
    existed during the period of review in Korea is supported by
    substantial evidence;

3.  Whether Commerce's regression-based particular market situation
    adjustment is supported by substantial evidence;

4.  Whether Commerce's calculation of constructed value profit and
    selling expenses is supported by substantial evidence;

5.  Whether Commerce's calculation of constructed export price profit is
    in accordance with the law; and

6.  Whether Commerce's exclusion of freight revenue in calculating
    SeAH's constructed export price is in accordance with the law.

## BACKGROUND

Commerce initiated this fourth administrative review ("OCTG IV") of the

antidumping duty order on OCTG from Korea for the period covering September

1, 2017 through August 31, 2018.  Initiation of Antidumping and Countervailing

Duty Admin. Reviews, 83 Fed. Reg. 57,411, 57,413–14 (Dep't of Commerce Nov.

15, 2018) (initiation notice).  Commerce selected Hyundai Steel Company

("Hyundai Steel") and SeAH as mandatory respondents for individual

examination.  Certain Oil Country Tubular Goods from the Republic of Korea, 84

Fed. Reg. 63,615, 63,615 (Dep't of Commerce Nov. 18, 2019) (prelim. results of

antidumping duty admin. review; 2017–2018); see also Decision Mem. for the

Prelim. Results of the 2017–2018 Admin. Review of the Antidumping Duty Order

on Certain Oil Country Tubular Goods from the Republic of Korea (Nov. 8, 2019)

("Prelim. DM"), PR 285.[1]

In the Final Results, Commerce assigned weighted-average dumping

margins of 0% for Hyundai Steel, 3.96% for SeAH, and 3.96% for non-examined

companies.  Final Results, 85 Fed. Reg. at 41,950.  Commerce based normal value

on constructed value for Hyundai Steel and SeAH because neither mandatory

respondent had a viable home market or third-country market during the period of

review.  Final IDM at 68.

---

[1] Citations to the administrative record reflect the public record ("PR") document
numbers.

Commerce applied a differential pricing analysis and calculated SeAH's weighted-average duty margin by the alternative average-to-transaction method. Id. at 79–91. Commerce determined that a particular market situation existed in Korea based on a totality-of-the-circumstances assessment of five factors, namely: (1) subsidies from the Government of Korea to producers of hot-rolled coil, (2) the deluge of Chinese hot-rolled products exerting downward pressure on Korean domestic hot-rolled coil prices, (3) strategic alliances between Korean hot-rolled coil suppliers and Korean OCTG producers, (4) the Government of Korea's influence over the cost of electricity, and (5) steel industry restructuring efforts by the Government of Korea. See id. at 5–6. Commerce used a regression-based analysis to quantify the impact of the particular market situation in Korea and adjusted for the particular market situation determination by increasing the reported hot-rolled coil costs by a rate of 17.13%. See id. at 49, 61; Final Calculations Mem. – SeAH Steel Corp. (July 6, 2020) ("SeAH Final Calculations Mem.") at 2, PR 350. Commerce utilized the 2018 financial statements of Tenaris S.A. ("Tenaris") and PAO TMK ("TMK") to calculate SeAH's constructed value profit and selling expenses. See Final IDM at 67. Commerce deducted SeAH's reported freight revenue up to actual freight cost and calculated SeAH's constructed export price profit rate using the Tenaris and TMK 2018 financial statements. See id. at 106, 109–11; see also Analysis of Data Submitted by SeAH

Steel Corp. for Prelim. Results (Nov. 8, 2019) ("SeAH Prelim. Calculations

Mem.") at 3, PR 290.

## JURISDICTION AND STANDARD OF REVIEW

The Court has jurisdiction under 19 U.S.C. § 1516a(a)(2)(B)(iii) and 28

U.S.C. § 1581(c), which grant the Court authority to review actions contesting the

final results of an administrative review of an antidumping duty order.  The Court

shall hold unlawful any determination found to be unsupported by substantial

evidence on the record or otherwise not in accordance with the law.  19 U.S.C.

§ 1516a(b)(1)(B)(i).

## DISCUSSION

### I.    Statutory Framework

Commerce determines antidumping duties by calculating the amount by

which the normal value of subject merchandise exceeds the export price or the

constructed export price for the merchandise.  Id. § 1673.  When reviewing

antidumping duties in an administrative review, Commerce must determine: (1) the

normal value and export price or constructed export price of each entry of the

subject merchandise, and (2) the dumping margin for each such entry.  Id.

§ 1675(a)(1)(B), (a)(2)(A).  The statute dictates the steps by which Commerce may

calculate normal value "to achieve a fair comparison" with export price or

constructed export price.  Id. § 1677b(a).

Commerce normally determines dumping margins "by comparing the weighted average of the normal values to the weighted average of the export prices (and constructed export prices) for comparable merchandise" or "by comparing the normal values of individual transactions to the export prices (or constructed export prices) of individual transactions for comparable merchandise." See id. § 1677f-1(d)(1)(A)(i)–(ii); JBF RAK LLC v. United States, 790 F.3d 1358, 1364–65 (Fed. Cir. 2015). Commerce may "compar[e] the weighted average of the normal values to the export prices (or constructed export prices) of individual transactions for comparable merchandise," if two statutory conditions are met: "there is a pattern of export prices (or constructed export prices) for comparable merchandise that differ significantly among purchasers, regions, or periods of time," and "[Commerce] explains why such differences cannot be taken into account using a method described in paragraph (1)(A)(i) or (ii)." 19 U.S.C. § 1677f-1(d)(1)(B).

If Commerce cannot determine the normal value of the subject merchandise based on home market sales, then Commerce may use qualifying third-country sales or constructed value as a basis for normal value. Id. § 1677b(a)(4), (a)(1)(B)(ii), (b)(1). Constructed value represents: (1) the cost of materials and fabrication or other processing of any kind used in producing the merchandise; (2) the actual amounts incurred and realized for selling, general, and administrative expenses, and for profits, in connection with the production and sales of a foreign

like product, in the ordinary course of trade, for consumption in the foreign

country; and (3) the cost of packing the subject merchandise. Id. § 1677b(e).

When calculating constructed value, if Commerce determines that a particular

market situation exists "such that the cost of materials and fabrication or other

processing of any kind does not accurately reflect the cost of production in the

ordinary course of trade, [then] [Commerce] may use . . . any other calculation

methodology." Id. The statute directs Commerce to calculate cost of production

and constructed value "based on the records of the exporter or producer of the

merchandise, if such records are kept in accordance with the generally accepted

accounting principles of the exporting country (or the producing country, where

appropriate) and reasonably reflect the costs associated with the production and

sale of the merchandise." Id. § 1677b(f)(1)(A).

　　　When Commerce is required to calculate constructed value for a respondent,

Commerce must utilize the respondent's actual selling, general, and administrative

expenses and profits from the home market or a third-country market. Id.

§ 1677b(e)(2)(A). If those data are unavailable, the statute provides Commerce

with three alternatives:

> (i)　　the actual amounts incurred and realized by the specific exporter
> or producer being examined in the investigation or review for
> selling, general, and administrative expenses, and for profits, in
> connection with the production and sale, for consumption in the

> foreign country, of merchandise that is in the same general category of products as the subject merchandise,
>
> (ii)    the weighted average of the actual amounts incurred and realized by exporters or producers that are subject to the investigation or review (other than the exporter or producer described in clause (i)) for selling, general, and administrative expenses, and for profits, in connection with the production and sale of a foreign like product, in the ordinary course of trade, for consumption in the foreign country, or
>
> (iii)   the amounts incurred and realized for selling, general, and administrative expenses, and for profits, based on any other reasonable method, except that the amount allowed for profit may not exceed the amount normally realized by exporters or producers (other than the exporter or producer described in clause (i)) in connection with the sale, for consumption in the foreign country, of merchandise that is in the same general category of products as the subject merchandise.

Id. § 1677b(e)(2)(B).

The statute also dictates the steps by which Commerce is to calculate export price or constructed export price (collectively, "U.S. price"). Export price is:

> the price at which the subject merchandise is first sold (or agreed to be sold) before the date of importation by the producer or exporter of the subject merchandise outside of the United States to an unaffiliated purchaser in the United States or to an unaffiliated purchaser for exportation to the United States,

subject to certain adjustments. Id. § 1677a(a). Constructed export price is:

> the price at which the subject merchandise is first sold (or agreed to be sold) in the United States before or after the date of importation by or for the account of the producer or exporter of such merchandise or by a seller affiliated with the producer or exporter, to a purchaser not affiliated with the producer or exporter,

subject to certain adjustments.  Id. § 1677a(b).  The price used to calculate export price and constructed export price is reduced by selling expenses, further manufacturing expenses, and the profit allocated to these expenses.  Id. § 1677a(d).

## II.    Differential Pricing Analysis

Commerce determined that the results of the differential pricing analysis justified using the alternative average-to-transaction methodology to calculate SeAH's dumping margin.  See Final IDM at 79.  SeAH argues that Commerce was required to support with substantial evidence its determination to apply the differential pricing analysis and the relevant numerical thresholds, but Commerce failed to do so.  SeAH's Br. at 36–38.  SeAH contends that Commerce's application of the Cohen's $d$ test to the non-normal distribution of SeAH's U.S. sales was unreasonable.  Id. at 38–43.

Commerce ordinarily uses an average-to-average ("A-to-A") comparison of "the weighted average of the normal values [of subject merchandise] to the weighted average of the export prices (and constructed export prices) for comparable merchandise" when calculating a dumping margin.  See 19 U.S.C. § 1677f-1(d)(1)(A)(i); 19 C.F.R. § 351.414(c)(1).  The statute allows Commerce to depart from using the A-to-A methodology and instead use an average-to-transaction ("A-to-T") comparison of the weighted average of normal values to the

export prices and constructed export prices of individual transactions for

comparable merchandise when: (1) Commerce observes "a pattern of export prices

(or constructed export prices) for comparable merchandise that differ significantly

among purchasers, regions, or periods of time;" and (2) "[Commerce] explains

why such differences cannot be taken into account using [the A-to-A

methodology]." 19 U.S.C. § 1677f-1(d)(1)(B)(i)–(ii). In contrast to the A-to-A

method, which may mask dumped sales at low prices by averaging them with sales

at higher prices, the A-to-T method allows Commerce "to identify a merchant who

dumps the product intermittently—sometimes selling below the foreign market

value and sometimes selling above it." Apex Frozen Foods Priv. Ltd. v. United

States, 862 F.3d 1337, 1341 (Fed. Cir. 2017) (citation and internal quotation marks

omitted). Commerce may apply the alternative A-to-T methodology on the same

basis in administrative reviews as in antidumping investigations. See JBF RAK

LLC, 790 F.3d at 1364–65.

The statute does not set forth the analysis for how Commerce is to identify a

pattern of price differences. See 19 U.S.C. §§ 1677, 1677f-1; see also Apex

Frozen Foods, 862 F.3d at 1346; Dillinger France S.A. v. United States, 981 F.3d

1318, 1325 (Fed. Cir. 2020). The Court affords Commerce deference in

determinations "involv[ing] complex economic and accounting decisions of a

technical nature." See Fujitsu Gen. Ltd. v. United States, 88 F.3d 1034, 1039 (Fed.

Cir. 1996) (citation omitted).  However, Commerce still "must [] explain [cogently] why it has exercised its discretion in a given manner." <u>Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.</u>, 463 U.S. 29, 48 (1983) (citation omitted).

Commerce applied its two-step differential pricing methodology in this case, the first step of which was the Cohen's *d* test.  <u>See</u> Final IDM at 79.  The standard of review for considering Commerce's differential pricing analysis is reasonableness.  <u>Stupp Corp. v. United States</u>, 5 F.4th 1341, 1353 (Fed. Cir. 2021). The U.S. Court of Appeals for the Federal Circuit and this Court have held the steps underlying the differential pricing analysis as applied by Commerce to be reasonable.  <u>See e.g.</u>, <u>Mid Continent Steel & Wire, Inc. v. United States</u>, 940 F.3d 662, 670–74 (Fed. Cir. 2019) (discussing zeroing and the 0.8 threshold for the Cohen's *d* test); <u>Apex Frozen Foods Priv. Ltd. v. United States</u>, 40 CIT __, __, 144 F. Supp. 3d 1308, 1314–35 (2016) (discussing application of the A-to-T method, the Cohen's *d* test, the meaningful difference analysis, zeroing, and the "mixed comparison methodology" of applying the A-to-A method and the A-to-T method when 33–66% of a respondent's sales pass the Cohen's *d* test), <u>aff'd</u>, 862 F.3d 1337; <u>Apex Frozen Foods Priv. Ltd. v. United States</u>, 862 F.3d 1322 (Fed. Cir. 2017) (affirming zeroing and the 0.5% *de minimis* threshold in the meaningful difference test).  However, the U.S. Court of Appeals for the Federal Circuit has

stated that "there are significant concerns relating to Commerce's application of the Cohen's *d* test . . . in adjudications in which the data groups being compared are small, are not normally distributed, and have disparate variances." Stupp, 5 F.4th at 1357.

The Cohen's *d* test is "a generally recognized statistical measure of the extent of the difference between the mean of a test group and the mean of a comparison group." Apex Frozen Foods, 862 F.3d at 1342 n.2. The Cohen's *d* test relies on assumptions that the data groups being compared are normal, have equal variability, and are equally numerous. See Stupp, 5 F.4th at 1357. Applying the Cohen's *d* test to data that do not meet these assumptions can result in "serious flaws in interpreting the resulting parameter." See id. at 1358.

In Stupp Corp. v. United States, 5 F.4th 1341 (Fed. Cir. 2021), the U.S. Court of Appeals for the Federal Circuit remanded Commerce's use of the Cohen's *d* test for further explanation because the data Commerce used may have violated the assumptions of normality, sufficient observation size, and roughly equal variances. Id. at 1357–60. The Court addressed Commerce's argument that it does not need to worry about normality because it is using a population instead of a sample, stating that Commerce's argument "does not address the fact that Professor Cohen derived his interpretive cutoffs under the assumption of normality." Id.

SeAH contends that Commerce's use of the Cohen's *d* test was contrary to well-recognized statistical principles. SeAH's Br. at 38–40. Specifically, SeAH argues that the Cohen's *d* test can only be used when comparing "random samples drawn from Normal (*i.e.*, bell-curve shaped) distributions with roughly equal variance containing a sufficient number of data points." Id. at 38. SeAH asserts that Commerce applied the Cohen's *d* test to data that lacked normality, a sufficient number of data points, and equal variances. Id. at 40 (citing SeAH Final Calculations Mem. Attach. 2). Commerce contends that it chose the Cohen's *d* test "to evaluate the extent to which the prices to a particular purchaser, region, or time period differ significantly from the prices of all other sales of comparable merchandise." Final IDM at 82 (quoting Prelim. DM at 10) (internal quotation marks omitted). Commerce explained that application of the Cohen's *d* test was appropriate because "the U.S. sales data . . . reported to Commerce constitutes a population. As such, sample size, sample distribution, and the statistical significance of the sample are not relevant to Commerce's analysis." Id. at 86.

In accordance with the U.S. Court of Appeals for the Federal Circuit's decision in Stupp, this Court concludes that use of a population, instead of a sample, does not negate the assumptions inherent to the Cohen's *d* test. The Court observes that Commerce did not explain whether the data used in its differential pricing analysis met the assumptions associated with the Cohen's *d* test. See Final

IDM at 86; see also Def.'s Resp. Opp'n Mots. J. Upon Admin. R. ("Def.'s Resp.")

at 39, ECF No. 52 ("[T]he Court has stated that 'Commerce has made no finding

that United States prices tend to exhibit a normal distribution'") (citation omitted).

The Court notes that the data cited by Commerce appear to contain a limited

number of data points and do not indicate whether they exhibit a normal

distribution. See SeAH Final Calculations Mem. Attach. 2. The evidence and

arguments before the Court call into question whether the data Commerce used in

its differential pricing analysis violated the assumptions of normality, sufficient

observation size, and roughly equal variances associated with the Cohen's $d$ test.

The Court remands for Commerce to further explain whether the limits on the use

of the Cohen's $d$ test were satisfied or whether those limits need not be observed

when Commerce uses the Cohen's $d$ test.

### III.    Particular Market Situation Determination

Commerce based normal value for SeAH on constructed value because

SeAH did not have a viable home market or third-country market during the period

of review. Final IDM at 68. In calculating constructed value, Commerce

determined that a particular market situation distorted the cost of production of

OCTG. See id. at 5–6, 26.

SeAH asserts that the record does not support Commerce's particular market

situation determination. SeAH's Br. at 5–7. Defendant United States

("Defendant") responds that record evidence considered in OCTG IV is timely and supports Commerce's determination of a particular market situation based on the cumulative effect of five factors related to the production of OCTG in Korea. Def.'s Resp. at 4–14.

The Trade Preferences Extension Act amended certain subsections of the Tariff Act of 1930.  See Trade Preferences Extension Act of 2015, Pub. L. No. 114-27, 129 Stat. 362 (2015).  When calculating constructed value under the revised statute, if Commerce determines that a particular market situation exists "such that the cost of materials and fabrication or other processing of any kind does not accurately reflect the cost of production in the ordinary course of trade, [Commerce] may use another calculation methodology under this subtitle or any other calculation methodology."  19 U.S.C. § 1677b(e).

In OCTG IV, covering the period from September 1, 2017 through August 31, 2018, Commerce determined that a particular market situation distorted the cost of production of OCTG based on the cumulative effect of five factors: (1) subsidization of Korean hot-rolled coil products by the Korean Government; (2) distortive pricing of unfairly-traded Chinese hot-rolled coil; (3) "strategic alliances" between Korean hot-rolled coil suppliers and Korean OCTG producers; (4) distortive government control over electricity prices in Korea; and (5) steel industry restructuring efforts by the Korean Government.  See Final IDM at 5–6.

Defendant-Intervenors U.S. Steel, Maverick Tube Corporation, Tenaris Bay City,

Inc., IPSCO Tubulars Inc. (formerly TMK IPSCO), Vallourec Star, L.P., and

Welded Tube USA Inc. collectively submitted a particular market situation

allegation letter with 226 attached exhibits.  See Domestic Interested Parties'

August 5 Particular Market Situation Submission (Aug. 5, 2019) ("OCTG IV

Allegation"), PR 177–208.  The Court observes that Commerce's examination of

the OCTG IV record overall, with related explanations, does not support

Commerce's determination that a particular market situation affected the cost of

production of OCTG.

As to the first factor, Commerce determined that subsidies of hot-rolled coil

production by the Government of Korea contributed to a particular market

situation.  Final IDM at 31.  Commerce supported its determination by citing

record evidence, including: an article in Korea Joongang Daily, dated December

27, 2018, titled "Restructuring to be Continued" ("Korea Joongang Daily Article");

an article in the Korea Times, dated August 11, 2016, titled "One-Shot Act to Take

Effect" ("Korea Times Article"); an article in Business Korea, dated June 10, 2016,

titled "Korean Government to Assist Steel Industry in Restructuring from August;"

an article in Kallanish Commodities, dated June 13, 2016, titled "Korea's 'One

Shot' Act Supports Steel Restructuring;" an article in Aju Business Daily, dated

November 22, 2016, titled "S. Korea Designates Two More Steel Firms for Fast-

Track Corporate Restructuring" ("Aju Business Daily Article"); an article in The
Investor, dated November 22, 2016, titled "Gov't Picks 3 Firms for Fast-Track
Restructuring;" an article in Pulse, dated November 23, 2016, titled "Hyundai
Steel, Dongkuk Steel Become Latest Beneficiaries of Fast-Track Restructuring
Program;" an article in Kallanish Commodities, dated November 23, 2016, titled
"Hyundai, Dongkuk Win 'One Shot' Government Approval;" an article in Pulse,
dated September 6, 2016, titled "Korean Gov't Selects 3 Firms to Benefit from
One-Shot Act;" an article by Yonhap News in the Korean Herald, dated February
28, 2017, titled "5 More Firms Picked for Fast-Track Restructuring Program;" an
article in Kallanish Commodities, dated January 23, 2017, titled "POSCO to Get
Government Aid for BF No. 1;" an article in Market Screener, dated June 12,
2017, titled "POSCO Pohang Blast Furnace No. 3 Is Transformed into a Super-
Large Black Furnace Equipped with Smart Infrastructure;" a press release by the
Ministry of Economy and Finance, dated March 3, 2017, titled "Tenth Ministerial
Meeting on Industrial Restructuring: Government to Pursue Restructuring Beyond
Shipping and Shipbuilding;" a press release by the Ministry of Economy and
Finance, dated January 23, 2019, titled "Sixth Ministerial Meeting on Boosting the
Economy" ("Ministry of Economy and Finance Press Release I"); an article by
Yonhap News, dated September 30, 2016, titled "S. Korea to Induce Steel,
Petrochemical Firms to Cut Output;" a press release by the Ministry of Economy

and Finance, dated January 25, 2017, titled "9th Ministerial Meeting on Industrial

Restructuring: 2017 Action Plan for Industrial Restructuring" ("Ministry of

Economy and Finance Press Release II"); an article in Business Korea, dated

January 26, 2017, titled "New Plans Released for Revival of Four Industries;" an

article in Business Korea, dated October 25, 2018, titled "South Korean Gov't

Plans to Inject 300 Bill. Won for Steel Innovation;" a press release by the Ministry

of Economy and Finance, dated December 28, 2018, titled "First Ministerial

Meeting on Boosting the Economy: First Meeting Discussing General Policies of

New Economic Team, as well as 2019 Economic Policies;" a press release by the

Ministry of Economy and Finance, dated March 13, 2019, titled "Tenth Ministerial

Meeting on Boosting the Economy: Government to Promote Private Investment in

Infrastructure;" a press release by the Ministry of Economy and Finance, dated

March 4, 2019, titled "Ninth Ministerial Meeting on Boosting the Economy:

Government to Focus on Boosting Exports;" a press release by the Ministry of

Economy and Finance, dated April 23, 2019, titled "Twentieth Ministerial Meeting

on Industrial Restructuring: Government to Persist with Its Restructuring Policies;"

the Other Factual Information Submission for Valuing Particular Market Situation

in Korea and Respondents' Constructed Value Profit in Case No. A-580-870;

Hyundai Steel's Response to Commerce's New Subsidies Questionnaire in Case

No. C-580-884, dated June 13, 2018 ("Hyundai Steel's Questionnaire Response");

and the final countervailing duty determination in Countervailing Duty
Investigation of Certain Hot-Rolled Steel Flat Products from the Republic of
Korea, 81 Fed. Reg. 53,439 (Dep't of Commerce Aug. 12, 2016) (final affirmative
determination; 2014), amended by Certain Hot-Rolled Steel Flat Products from
Brazil and the Republic of Korea, 81 Fed. Reg. 67,960 (Dep't of Commerce Oct. 3,
2016) (amended final affirmative countervailing duty determinations and
countervailing duty orders; 2014), amended by Certain Hot-Rolled Steel Flat
Products From the Republic of Korea, 84 Fed. Reg. 23,019 (Dep't of Commerce
May 21, 2019) (notice of court decision not in harmony with amended final
determination of the countervailing duty investigation). See id. at 31–33 (citing
OCTG IV Allegation Exs. 15, 77–100).

The record evidence cited by Commerce does not support Commerce's
determination that programs and subsidies offered by the Government of Korea
contributed to a particular market situation during the period of review. Commerce
cited the OCTG IV Allegation, which referred to the subsidy rates of 0.55–0.58%
in Certain Hot-Rolled Steel Flat Products from the Republic of Korea, 84 Fed.
Reg. 28,461 (final results of countervailing duty admin. review, 2016). See Final
IDM at 32 n.144 (citing OCTG IV Allegation at 27 n.106). The Court notes that
record documents cited by Commerce suffer from a temporal problem because the
documents discuss programs and subsidy rates from 2016 and early 2017, prior to

the OCTG IV period of review between September 1, 2017 and August 31, 2018,

or programs and subsidy rates from 2019, after the period of review.  See id.;

OCTG IV Allegation Exs. 77–95, 96–100.

The Court observes that record documents reviewed by Commerce discuss

the restructuring programs and subsidies offered to non-steel industries and

anticipated restructuring efforts of the steel industry, but do not show that OCTG

producers actually received subsidies by taking advantage of the Government of

Korea's approved restructuring programs during the period of review.  See OCTG

IV Allegation Exs. 81, 84–86; see also Case Br. of Hyundai Steel Co. (Jan. 6,

2019) at 54, PR 311 (stating that Hyundai Steel disputes whether it took advantage

of the restructuring program, despite having received approval to participate in the

program).  While some record documents cited by Commerce illustrate that OCTG

producers took advantage of programs and subsidies, the Court notes that these

documents suffer from a temporal problem as they discuss actions taken in 2016,

prior to the OCTG IV period of review.  See OCTG IV Allegation Exs. 85, 87, 88.

None of the record documents cited by Commerce show that Korean OCTG

producers received subsidies or participated in subsidy programs during the period

of review.  The Court holds that the record evidence cited by Commerce does not

support Commerce's determination that OCTG producers received subsidies from

the Government of Korea that contributed to a particular market situation in Korea

because the record evidence cited by Commerce suffers from a temporal problem

and does not show that OCTG producers actually received subsidies during the

period of review.  In summary, the Court concludes with respect to the first factor

that Commerce's determination that subsidized hot-rolled coil contributed to a

particular market situation that distorted the cost of OCTG production is not

supported by substantial evidence.

As to the second factor, Commerce determined that "significant

overcapacity in steel production" from the People's Republic of China ("China")

has "flooded [the Korean steel market] with imports of cheap steel products,"

exerting downward effects on Korean steel prices.  Final IDM at 28–29.

Commerce cited record documents in support of its determination, including: an

article in the Korea Times, dated September 29, 2016, titled "Gov't Seeks

Restructuring of Steelmaking, Petrochemical Industries;" an article by Bloomberg,

dated July 31, 2018, titled "China's Steelmakers Are Smashing Production

Records;" an article by S&P Global Platts, dated May 13, 2019, titled "Chinese

Steel Output Rises Relentlessly Despite Plant Closures;" an article in the Business

Recorder, dated December 28, 2017, titled "Global Steel's 'China' Problem"

("Business Recorder Article"); an article in Kallanish Commodities, dated March

20, 2017, titled "China Loosens Credit for Coal and Steel Companies;" an article

by Reuters, dated December 15, 2017, titled "China Will Cut, Remove Export

Tariffs on Some Steel, Fertilizer;" an article by Reuters, dated January 10, 2018,

titled "China's Shanxi Province Sets Up Steel Fun Worth $770 Mln;" an article by

S&P Global Platts, dated May 28, 2019, titled "Chinese Steel Output Reaches New

Heights;" an article by the Southeast Asian Iron and Steel Institute, dated January

28, 2019, titled "Global Crude Steel Output Increases by 4.6 Percent in 2018;" an

article by the Southeast Asian Iron and Steel Institute, dated November 7, 2018,

titled "Baowu Says China Steel Output to Hit Record Level in 2018;" an article in

Kallanish Commodities, dated May 19, 2017, titled "China Explains why Capacity

Curbs Mean More Steel;" an article by Reuters, dated December 3, 2017, titled

"China's 2018 Steel Output Seen Rising Even After Mill Closures;" an article by

Xinhua, dated May 11, 2019, titled "Iron and Steel Industry Posts Rising Revenue,

but Plummeting Profit;" an article by the American Metal Market, dated June 1,

2018, titled "China's Steel Export Prices Set Global Tone;" an article in the South

China Morning Post, dated June 6, 2019, titled "In China's Industrial Hinterlands,

State Subsidies Run Deep and Appetite for Reform Is Low Despite US Demands;"

and a presentation to the OECD Steel Committee, titled "Korean Iron and Steel

Market in 2017." See Final IDM at 28–31 & nn.115–40 (citing OCTG IV

Allegation Exs. 6, 15–32, 37–39, 42, 52–54, 224, 225).[2]

---

[2] Commerce also cited the following exhibits: an article by the American Metal
Market, dated February 22, 2017, titled "China Remains Steel Behemoth;" an

The record evidence cited by Commerce does not support a determination that the influx of Chinese hot-rolled coil is particular to Korea because the record documents describe a global influx that affected many other countries in addition to Korea, rather than an effect that is unique or particular to Korea.  See OCTG IV Allegation Exs. 6, 17–18, 21, 23–31, 42, 224, 225.  Commerce noted that Korea was China's second largest export market for hot-rolled products in 2017 and 2018.  Final IDM at 30.  The Court observes that the record evidence cited by Commerce does not indicate that the experience in Korea due to Chinese hot-rolled coil imports is distinct from the experience in other countries around the world, which were also inundated with the global oversupply of low-priced Chinese

article by the American Metal Market, dated February 13, 2017, titled "China's Steel Capacity Up Despite Cut Attempts;" a 2016 article in Asian Steel Watch, titled "China's Steel Exports, Reaching 100 Mt: What It Means to Asia and Beyond;" a report in the Global Steel Trade Monitor, dated February 2017, titled "Steel Imports Report: Japan;" a report by the International Monetary Fund, dated August 8, 2017, titled "People's Republic of China: Staff Report for the 2017 Article IV Consultation;" five exhibits submitted in Case No. A-580-880 over heavy walled rectangular welded carbon steel pipes and tubes from Korea; the particular market situation allegation from Case No. A-489-501 over circular welded carbon steel standard pipe and tube products from Turkey; and the particular market situation allegation from Case No. A-533-502 over circular welded carbon steel standard pipe and tube products from India.  See Final IDM at 28–31 & nn.117, 118, 121, 125, 126, 128, 137–40 (citing OCTG IV Allegation Exs. 15, 16, 19, 20, 22, 32, 37–39, 52–54).  These exhibits were not included in the Joint Appendix, so the Court was unable to review them.  See J.A., ECF Nos. 58, 59.

products.  See OCTG IV Allegation Exs. 6, 17–18, 21, 23–31, 42, 224, 225.

Although it is clear that the oversupply of low-priced Chinese products affected

many countries in the global market, the Court notes that Commerce cited nothing

on the record to support its determination that the oversupply of low-priced

Chinese products is *particular* to the Korean market.  See id.  Commerce

acknowledged that the "global steel overcapacity crisis . . . [has] far-reaching

effects world-wide," undermining its determination that Chinese hot-rolled coil

imports contributed to a particular market situation in Korea.  Final IDM at 28; see

Husteel Co. v. United States, 44 CIT __, __, 426 F. Supp. 3d 1349, 1391 (2020)

("Although 19 U.S.C. § 1677b may not demand that a [particular market situation]

be such that it only affects the subject market, there is no evidence on the record

that Chinese overcapacity affects the Korean market in some way that is specific to

the Korean market at all.").

    The Court observes that the record evidence cited by Commerce does not

support a conclusion that the global glut of Chinese hot-rolled coil imports caused

price distortions specific to the Korean steel market.  The Court holds that

Commerce's determination that excess capacity of Chinese hot-rolled coil imports

contributed to a particular market situation in Korea is not supported by substantial

evidence.

As to the third factor, Commerce determined that strategic alliances between

certain Korean hot-rolled coil producers and Korean OCTG producers affected the

cost of hot-rolled coil and contributed to a particular market situation.  Final IDM

at 33–34.  Commerce cited the following record documents in support of its

determination: a report by the Korean Free Trade Commission, dated September 7,

2018, titled "KFTC Sanctions Six Steel Manufacturing Companies for Price

Fixing;" an article by S&P Global Platts, dated September 10, 2018, titled "South

Korea's FTC Fines Six Steelmakers for Rebar Price Rigging;" an article in the

Korean Herald, dated September 9, 2018, titled "Six-Largest Steel Firms Fined

W100b Over Price Fixing;" an article in the Korea Times, dated December 20,

2017, titled "Steelmakers Fined W.92 Bil. For Bid Rigging;" an article in Pulse,

dated September 10, 2018, titled "FTC Slaps Biggest Fine on Korean Rebar

Suppliers for Price Fixing;" an article in Kallanish Commodities, dated September

10, 2018, titled "South Korea Fines Rebar Mills for Price Fixing;" an article by

Yonhap News, dated September 9, 2018, titled "Steelmakers Fined Over Price

Collusion;" a report by the Korean Free Trade Commission, dated December 21,

2017, titled "KFTC Punishes Six Steel Pipe Manufacturers for Rigging Bids

Offered by Korea Gas Corporation;" an article by Yonhap News, dated May 7,

2017, titled "Hyundai Steel fined 312 Mln Won for Obstructing FTC's Probe;" an

article by Yonhap News, dated July 7, 2016, titled "Eight Business Groups Engage

in Cross-Shareholding FTC;" an article by the Council on Foreign Relations, dated

May 4, 2018, titled "South Korea's Chaebol Challenge;" an article by CNBC

News, dated October 9, 2018, titled "Seoul Relies on Chaebols for North Korea

Investment So Reform Doubtful;" an article by the Sage Business Researcher,

dated August 21, 2017, titled "South Korea's Conglomerates;" an article by CNN,

dated January 17, 2107, titled "South Korea's Long History of Light Sentences for

Business Leaders;" and an article by The Globe and Mail, dated May 12, 2018,

titled "South Korea's Chaebol Problem." See Final IDM at 33–34 & nn.148–51

(citing OCTG IV Allegation Exs. 101–20).[3]

Commerce conceded that the record shows that SeAH is being fined for bid-

rigging schemes that occurred before the OCTG IV period of review. Id. at 34.

But Commerce asserted that unfair corporate practices are "a long-term, chronic

occurrence" and that the record does not indicate that unfair corporate practices did

not continue to occur during the OCTG IV period of review. Id. The record

---

[3] Commerce also cited the following exhibits: an article by Foley & Lardner LLP, dated April 16, 2013, titled "Another Steelmaker Subsidiary Raided in International Antitrust Investigation;" a 2005 article in The Korean Journal of International Relations, titled "The Origins of Korean Chaebols and Their Roots in the Korean War;" and three exhibits submitted in Case No. A-580-876 over welded line pipe from Korea. See Final IDM at 33 & n.148 (citing OCTG IV Allegation Exs. 109, 111–13, 118). These exhibits were not included in the Joint Appendix, so the Court was unable to review them. See J.A.

documents cited by Commerce relate to findings of unfair corporate action that occurred prior to 2017.  See OCTG IV Allegation Exs. 101–08, 110, 119–20.  The Court observes that no record evidence cited by Commerce relates to unfair corporate action or other strategic alliances during the OCTG IV period of review from 2017–2018 in this case.  See id. Exs. 101–08, 110, 114–17, 119–20.  Because none of the record evidence pertains to actions within the OCTG IV period of review, Commerce's purely speculative conclusions that strategic alliances "may have created distortions" and "may continue to impact [hot-rolled coil] pricing in a distortive manner during the [OCTG IV] [period of review] and in the future" are not supported by substantial evidence on the record.  See Final IDM at 34.  The Court holds that Commerce's determination that strategic alliances between Korean hot-rolled coil producers and Korean OCTG producers affected prices in the Korean steel market and contributed to a particular market situation during the OCTG IV period of review is not supported by substantial evidence.

As to the fourth factor, Commerce determined that the Korean Government's regulation of the Korean electricity market contributed to a particular market situation.  Id.  Commerce cited the following record documents in support of its determination: the Form 20-F annual report filed by Korea Electric Power Corporation ("KEPCO") with the U.S. Securities and Exchange Commission for the fiscal year ending December 31, 2018; an article in Business

Korea, dated February 14, 2019, titled "KEPCO Expected to Post 2.4 Tril. Won in

Operating Loss This Year;" an article in Korea Joongang Daily, dated May 15,

2019, titled "Records Big Loss in First Quarter of 2019;" and an article in Korea

Joongang Daily, dated February 23, 2019, titled "KEPCO Reports an Operating

Loss; the First in Six Years." See Final IDM at 34–35 & nn.152–58 (citing OCTG

IV Allegation Exs. 121, 217–19).

    The record evidence cited by Commerce does not support a determination

that the Korean Government's regulation of the electricity market contributed to a

particular market situation.  Commerce determined that Korean electricity prices

"cannot be considered to be competitively set" because the Korean Government

exercises control over KEPCO, which reported an operating loss in 2018.  Id. at 34

(citing OCTG IV Allegation Exs. 217–19).  The record evidence cited by

Commerce indicates that KEPCO reported an operating loss due to increased

environmental and renewable energy costs, decreased electricity demand due to

warmer winter weather, and higher natural gas prices.  See OCTG IV Allegation

Exs. 121, 217–19.  The Court observes that the record evidence reviewed by

Commerce does not appear to indicate that operating losses were a result of

government regulation or that electricity prices were not competitively set.  See id.

The Court also notes that the record evidence cited by Commerce does not indicate

that Korean steel manufacturers received countervailable subsidies as to electricity.

See id.  Because the record evidence cited by Commerce does not show that the Korean Government's regulation of the electricity market resulted in subsidies being granted to Korean steel manufacturers or prices not being competitively set, the Court holds that Commerce's determination that Korean Government regulation distorted electricity prices and affected prices in the Korean steel market, contributing to a particular market situation during the OCTG IV period of review, is not supported by substantial evidence.

As to the fifth factor, Commerce determined that the Korean Government's steel industry restructuring efforts to provide subsidies to participating companies contributed to a particular market situation.  Final IDM at 35–36.  Commerce cited the following record documents in support of its determination: Hyundai Steel's Questionnaire Response; an article in Kallanish Commodities, dated September 19, 2017, titled "Korea Should Close 4-5M t-y Plate Capacity BCG;" the Korea Joongang Daily Article; the Korea Times Article; the Aju Business Daily Article; the Ministry of Economy and Finance Press Release I; the Ministry of Economy and Finance Press Release II; and the Business Korea Article.  See Final IDM at 35–36 & nn.159–68 (citing OCTG IV Allegation Exs. 7, 77, 78, 81, 93, 94, 124).

The Court observes that the record does not support Commerce's determination that Korean OCTG producers took advantage of or received benefits from restructuring programs during the period of review.  See OCTG IV

Allegation Exs. 7, 77, 81, 93, 94, 124.  For example, Commerce cited the Aju

Business Daily Article stating that Hyundai Steel had received approval to proceed

with corporate restructuring as evidence that OCTG producers took advantage of

restructuring programs, but the record does not indicate that Hyundai Steel actually

took advantage of restructuring efforts during the period of review, and Hyundai

Steel asserts that it did not take advantage of restructuring efforts.  See OCTG IV

Allegation Ex. 81; Case Br. of Hyundai Steel Co. at 54.  The Court notes that one

article cited by Commerce states that the Korean Government was "ask[ing] the

steel industry to execute a voluntary restructuring," but the article does not state

that any Korean steel manufacturers had taken advantage of voluntary restructuring

programs.  See OCTG IV Allegation Ex. 124.  Record evidence cited by

Commerce discusses restructuring programs backed by the Korean Government

and laws passed to facilitate these programs, but does not show that Korean steel

manufacturers took advantage of these programs during the period of review.  See

OCTG IV Allegation Exs. 78, 93, 94.

The Court observes that record evidence cited by Commerce also has a

temporal problem, as it covers restructuring efforts outside of the period of review.

See OCTG IV Allegation Exs. 77, 78, 81, 94.  For example, Commerce cited

several articles discussing restructuring that are dated from 2016, prior to the

OCTG IV period of review covering 2017–2018.  See OCTG IV Allegation Ex.

77, 78, 81.  Further, a press release cited by Commerce indicates that ten trillion

Korean won were allocated for business restructuring in 2019, outside of the

OCTG IV period of review between 2017 and 2018.  See OCTG IV Allegation Ex.

90.  The Court concludes that the mere existence of restructuring efforts, absent

evidence of actual restructuring and government interference during the period of

review, is insufficient to contribute to the existence of a particular market situation.

The Court holds that Commerce's determination that the Korean Government's

steel industry restructuring contributed to a particular market situation in Korea is

not supported by substantial evidence.

In summary, the Court concludes that substantial record evidence does not

support Commerce's cumulative particular market situation determination in Korea

for the 2017–2018 period of review because the record evidence does not

demonstrate the existence during the period of review of the five factors allegedly

underlying the particular market situation determination.  The Court remands

Commerce's particular market situation determination for further explanation or

reconsideration consistent with this opinion.

## IV.    Calculation of Particular Market Situation Adjustment with Regression Analysis

Commerce calculated a particular market situation adjustment for SeAH

based on a regression analysis.  See Final IDM at 49–50.  Commerce used the

regression analysis to quantify the particular market situation that it determined

existed in Korea.  See id. at 52–61.  At this time, the Court need not assess whether

Commerce's determination to use a regression-based adjustment is supported by

substantial evidence because the Court holds that Commerce's determination that a

particular market situation existed is not supported by substantial evidence.

### V.    Constructed Value Profit Calculation

Commerce calculated constructed value profit and selling expenses by "any

other reasonable method," based on the Tenaris and TMK 2018 financial

statements, citing them as the best information available on the record.  Id. at 67.

SeAH argues that Commerce should have used SeAH's third-country sales to

calculate constructed value profit and selling expenses; that, in the alternative,

Commerce's selection of financial statements is not supported by substantial

evidence; and that Commerce failed to apply a "profit cap" in accordance with the

relevant statute.  SeAH's Br. at 22–33.

If Commerce determines that a respondent's actual selling, general, and

administrative expenses and profits from the home market or a third-country

market are unavailable when calculating constructed value for the respondent, the

statute provides Commerce with three alternative calculation methods.  See 19

U.S.C. § 1677b(e)(2).  When calculating constructed value by the third alternative

method, Commerce may use "any other reasonable method" to calculate profits

and selling, general, and administrative expenses.  Id. § 1677b(e)(2)(B).  "The objective is to find a good proxy (or surrogate) for the profits that the respondent can fairly be expected to build into a fair sales price of the particular merchandise." Mid Continent Steel & Wire v. United States, 941 F.3d 530, 542 (Fed. Cir. 2019) (citations omitted).

In calculating constructed value, Commerce determined that SeAH did not have a viable home market or third-country market during the period of review for purposes of calculating constructed value profit and selling expenses under 19 U.S.C. § 1677b(e)(2)(A).  Final IDM at 67–68.  When considering the statutory alternatives under 19 U.S.C. § 1677b(e)(2)(B)(i)–(iii), Commerce eliminated subsection (i) because SeAH's other steel products were in different categories than OCTG, and subsection (ii) because SeAH had no sales of OCTG in the home market of Korea in the ordinary course of trade.  Id. at 69.  Commerce calculated constructed value under subsection (iii), using "any other reasonable method."  Id.

## A.    Commerce's Selection of Surrogate Financial Statements

SeAH argues that Commerce should have selected SeAH's home-market or third-country sales as surrogate financial statements instead of the Tenaris and TMK 2018 financial statements.  SeAH's Br. at 22–25.

The eleven sources of information on the record identified by Commerce included: SeAH's Canadian-market data from the first administrative review of the

antidumping duty order on OCTG from Korea; SeAH's third-country sales of

OCTG; Hyundai Steel's home-market sales of non-prime OCTG; Hyundai Steel's

home-market sales of line pipe; and the financial statements of seven non-Korean

producers, Tenaris, TMK, Borusan Mannesmann Boru Sanayi ve Ticaret A.S.

("Borusan"), Chung Hung Steel Corporation ("Chung Hung"), Nippon Steel and

Sumitomo Metal Corporation ("NSSMC"), Welspun Corp. Limited ("Welspun"),

and Maharashtra Seamless Limited ("Maharashtra").  Final IDM at 70.  Commerce

noted that many of these sources were not viable, as they included primarily sales

of non-OCTG products; lacked sufficient detail to determine the amount of sales

revenue from OCTG products; failed to show a profit on sales; reflected sales data

from non-viable markets; reflected profit data for line pipe; or were not

contemporaneous with the period of review.  Id.  Commerce chose to calculate

constructed value profit by utilizing the Tenaris and TMK 2018 financial

statements.  Id. at 67, 70.  Commerce favored the Tenaris and TMK 2018 financial

statements as the best information available on the record that reflected the profit

of a Korean OCTG producer on sales of OCTG in the ordinary course of trade.  Id.

at 71.

Using subsection (iii) to calculate constructed value, Commerce may use

"any reasonable method" to determine constructed value.  See 19 U.S.C.

§ 1677b(e)(2)(B)(iii).  Commerce determined that the home-market data were for

non-OCTG products and sales "not made in the ordinary course of business, *i.e.*,

transacted in a non-viable market at a net loss," and that the third-country market

data failed the viability test.  Final IDM at 71.  Because the home-market and third-

country market data were from non-viable markets, Commerce reasoned that it

would be inconsistent and unreasonable to use this data to calculate constructed

value profit and selling expenses.  Id. at 71–72.  Commerce noted that the Tenaris

and TMK 2018 financial statements did not suffer from viability concerns and

selected them as the best available information.  Id. at 72.

SeAH does not challenge Commerce's determination that SeAH's home-

market sales and third country market sales were non-viable, and does not dispute

that Commerce's standard practice is to disregard sales from non-viable markets

when calculating constructed value profit under 19 U.S.C. § 1677b(e)(2)(A).  See

SeAH's Br. at 23–24.  The Court observes that record evidence reviewed by

Commerce indicates that data from Tenaris and TMK did not suffer from viability

concerns, as the data showed sufficient sales populations compared to U.S. sales—

five percent or more of the aggregate quantity (or value) of the subject

merchandise sold in the United States.  See 19 U.S.C. § 1677b(a)(1)(B)(ii)(II);

Constructed Value Profit and Selling Expense Comments and Information (July

26, 2019) ("Tenaris 2018 Annual Report") Ex. 14, PR 135–37; Resp. to Req.

[Constructed Value] Profit and Selling Expense Information ("TMK 2018 Annual

Report") Attach. 1, PR 125–27, 132.  The Court notes that the statute instructs

Commerce to exclude sales from non-viable markets when determining normal

value based on home market sales or third-country sales.  See 19 U.S.C.

§ 1677b(a)(1)(B), (C).  The Court regards as reasonable Commerce's explanation

that use of data from sales in non-viable markets to calculate constructed value

could result in the constructed value being equal to a normal value that is based on

non-viable market sales, which the statute does not permit.  See id.; Final IDM at

71.  The Court concludes that Commerce's use of the Tenaris and TMK 2018

financial statements is reasonable and supported by substantial evidence.

SeAH argues that, if Commerce relies on surrogate financial statements,

Commerce should exclude Tenaris' financial statements in the calculation of

constructed value profit because Tenaris' sales to North America constitute 48% of

its total sales and because a $6 million grant received by one of Tenaris'

subsidiaries in 2013 constitutes a subsidy that distorts the 2018 data.  SeAH's Br.

at 25–27.  Because Commerce determined that there was no information on the

record regarding profit on sales of OCTG, or products in the same category, in

Korea, Commerce reasoned that the Tenaris and TMK financial statements

represented the best available information.  See Final IDM at 71 (stating that "their

business operations and products are most similar to those of . . . SeAH").

Commerce determined that Tenaris and TMK are significant producers of OCTG

and their financial statements represent sales of mainly OCTG in a broad range of

geographic markets.  See id.; see also Prelim. DM at 18.  Commerce determined

that both Tenaris and TMK have "significant non-U.S. sales" and are suitable to be

used to calculate constructed value profit.  Final IDM at 71, 73.

      The Court observes that record evidence cited by Commerce shows that over

50% of Tenaris' net sales and over 75% of TMK's net sales were to end users in

non-U.S. markets in 2018.  See Tenaris 2018 Annual Report; TMK 2018 Annual

Report.  Because record evidence cited by Commerce shows that over 50% of

Tenaris' 2018 net sales were to end users in non-U.S. markets, the Court finds that

Commerce's determination that Tenaris has significant non-U.S. sales, sufficient to

use Tenaris' financial statements in the calculation of constructed value profit, is

reasonable and supported by substantial evidence.

      Further, Commerce reviewed Tenaris' 2018 financial statements and

determined that the grant received by Tenaris in 2013 did not distort the 2018 data.

Final IDM at 73.  Defendant asserts that the $6 million grant that Tenaris received

in 2013 is not a countervailable subsidy and that, even if the grant constitutes a

subsidy, it would have been fully allocated to 2013 as a non-recurring subsidy.

Def.'s Resp. at 26.  Under 19 C.F.R. § 351.524, non-recurring benefits are

allocated over a number of years corresponding to the average useful life of

renewable physical assets, except when the benefit is less than 0.5% of relevant

sales—in which case the benefit is allocated to the year in which it is received. 19
C.F.R. § 351.524(b). Defendant asserts that, because the $6 million grant
accounted for less than 0.5% of Tenaris' net sales, the benefit would have been
allocated in its entirety to 2013 and would not impact the 2018 financial
statements. Def.'s Resp. at 26. Commerce determined, therefore, that Tenaris'
2018 financial statements did not need to be excluded due to subsidies. Final IDM
at 73.

The Court observes that Tenaris' financial statements, cited by Commerce,
do not show subsidies and indicate that that the grant accounted for less than 0.5%
of Tenaris' net sales. See Tenaris 2018 Annual Report. Based on the record
evidence cited by Commerce, indicating that the grant accounted for less than
0.5% of Tenaris' net sales, and the relevant regulation instructing non-recurring
benefits to be allocated to the year in which they are received, the Court concludes
that Commerce's determination that the 2013 grant did not distort Tenaris' 2018
financial statements is reasonable and supported by substantial evidence.

SeAH argues also that Commerce should include Chung Hung's financial
statements in the calculation of constructed value profit. SeAH's Br. at 28–29.
Commerce determined that Chung Hung's sales were not specific to the OCTG
industry and that Chung Hung's customer base did not correspond to that of a
global OCTG producer. Final IDM at 72. Commerce explained that Chung

Hung's OCTG sales account for less than 6.8% of total sales, while other data on the record, the Tenaris and TMK financial statements, included significant OCTG sales.  Id.  Commerce reasoned that, because it is "particularly important to use financial statements from a producer of identical merchandise," it is "unnecessary" for Commerce to rely on Chung Hung's data when there are more closely analogous data available on the record.  See id.

The Court observes that the Chung Hung 2018 Annual Report cited by Commerce supports Commerce's determination that Chung Hung's OCTG sales account for less than 6.8% of total sales.  See Resp. to Req. [Constructed Value] Profit and Selling Expense Information Attach. 2, PR 125–27, 132.  The Court notes that Commerce reviewed record evidence that supports its determination that Tenaris and TMK's data were more closely analogous than Chung Hung's data to Korean OCTG producers.  See id.; Tenaris 2018 Annual Report; TMK 2018 Annual Report.  The Court concludes, therefore, that Commerce's determination not to include Chung Hung's financial statements in the calculation of constructed value profit is reasonable and supported by substantial evidence.

## B.   Commerce's Determination Not to Apply A Profit Cap

SeAH argues that Commerce's calculation of constructed value profit is inconsistent with the statute because Commerce did not apply a "profit cap." SeAH's Br. at 31–33.  SeAH argues that Commerce's "use of the same rate for

[constructed value] profit and the profit cap is essentially a failure to calculate a

profit cap" and that Commerce erred by not applying a profit cap based on the

profit earned on Hyundai Steel's home-market sales of OCTG or SeAH's third-

country sales of OCTG produced in Korea.  Id.

      In utilizing a "reasonable method" under subsection (iii), Commerce

normally must apply an upward limit for profit, commonly termed the "profit cap."

Atar S.r.l. v. United States, 730 F.3d 1320, 1322 (Fed. Cir. 2013) (citation

omitted).  "This 'profit cap' prevents the 'various possible calculation methods

from yielding anomalous results that stray beyond the amount normally realized

from sales of merchandise in the same general category.'"  Mid Continent Steel &

Wire, 941 F.3d at 545 (quoting Atar S.r.l., 730 F.3d at 1327).  Congress

contemplated situations, however, in which a profit cap would not be calculable:

> [W]here, due to the absence of data, Commerce cannot determine
> amounts for profit under alternatives (1) and (2) or a "profit cap" under
> alternative (3), it might have to apply alternative (3) on the basis of "the
> facts available."  This ensures that Commerce can use alternative (3)
> when it cannot calculate the profit normally realized by other
> companies on sales of the same general category of products.

Id. (quoting Uruguay Round Agreements Act, Statement of Administrative Action

("SAA"), H.R. Doc. No. 103-316, vol. 1 at 841 (1994), reprinted in 1994

U.S.C.C.A.N. 4040, 4177).  When Commerce explains reasonably that information

is not available for Commerce to calculate a profit cap, Commerce may calculate

constructed profit under subsection (iii) without calculating a profit cap.  Id. at

545–46.

     Commerce explained here that "[it] [wa]s unable to calculate a profit cap

based on the actual amounts reported in accordance with the statutory intent under

section [1677b(e)(2)(B)(iii)]" because "[t]here is no profit information for sales in

Korea of OCTG and products in the same general category on the record."  Final

IDM at 74; see also Mid Continent Steel & Wire, 941 F.3d at 545 ("[T]he

statutorily specified information was not available to calculate a profit cap" when

"there [wa]s no viable domestic market in the exporting country for merchandise

that is in the same general category of products as the subject merchandise.").

Commerce noted that the record did not contain any information regarding the

profit for sales in Korea of OCTG and products in the same general category.  See

Final IDM at 74.  Because Commerce articulated a reasonable justification for its

decision, tied to the record in the proceeding, the Court concludes that

Commerce's decision not to calculate a profit cap when the statutorily specified

information was not available is reasonable.

### C.    Commerce's Application of Unadjusted Costs to Adjusted Costs

     SeAH argues that Commerce incorrectly applied the unadjusted Tenaris and

TMK 2018 financial statements to SeAH's adjusted costs.  SeAH's Br. at 29–30.

Commerce reasoned that the particular market situation adjustment allowed

SeAH's costs to "more accurately reflect 'the [cost of production] in the ordinary

course of trade.'"  Final IDM at 61.  Commerce asserted that, because there is no

evidence that a particular market situation affects Tenaris or TMK, it would be

inaccurate to adjust their costs.  Id.  Commerce asserted that the unadjusted Tenaris

and TMK data and the adjusted SeAH data each most accurately reflect costs in the

ordinary course of trade.  Id.  Commerce determined that it was reasonable to

apply the unadjusted Tenaris and TMK 2018 financial statements to SeAH's

adjusted costs when calculating the constructed value profit and selling expenses.

Id.

        As discussed in detail above, the Court holds that Commerce's

determination that a particular market situation affected the cost of production of

OCTG in Korea is not supported by substantial evidence.  See supra Part III.  The

Court notes that Commerce's determination to apply unadjusted costs to SeAH's

adjusted costs was based on its finding that a particular market situation affected

SeAH's costs.  See Final IDM at 61.  Because the Court remands Commerce's

particular market situation determination and does not consider Commerce's

regression-based particular market situation adjustment, the Court likewise does

not consider at this time whether Commerce's application of unadjusted costs to

adjusted costs is reasonable and supported by substantial evidence.

### VI.   Constructed Export Price Profit Calculation

Commerce calculated SeAH's constructed export price profit rate using the

same data that Commerce used to calculate the constructed value profit, the

Tenaris and TMK 2018 financial statements.  See Final IDM at 5, 106; Prelim. DM

at 13–14.  SeAH argues that Commerce should have used SeAH's financial

statements to calculate SeAH's constructed export price profit rate and that

Commerce is not permitted by statute to use other information.  See SeAH's Br. at

33–35.

When a foreign producer or exporter sells a product to a U.S. selling

affiliate, the law permits using "constructed export price" in calculating the

dumping margin.  19 U.S.C. § 1677a(d).  Constructed export price is "the price at

which the subject merchandise is first sold (or agreed to be sold) in the United

States before or after the date of importation by or for the account of the producer

or exporter of such merchandise or by a seller affiliated with the producer or

exporter, to a purchaser not affiliated with the producer or exporter," subject to

certain adjustments.  Id. § 1677a(b).  To calculate constructed export price, this

price is reduced by selling expenses, further manufacturing expenses, and the profit

allocated to these expenses.  Id. § 1677a(d).  To determine profit, Commerce "may

rely on any appropriate financial reports, including public, audited financial

statements, or equivalent financial reports, and internal financial reports prepared

in the ordinary course of business." 19 C.F.R. § 351.402(d)(2). Section

1677a(f)(1) of the statute states that "profit shall be an amount determined by

multiplying the total actual profit by the applicable percentage." 19 U.S.C.

§ 1677a(f)(1). Total actual profit is "the total profit earned by the foreign

producer, exporter, and affiliated parties described in subparagraph (C) with

respect to the sale of the same merchandise for which total expenses are

determined under such subparagraph." Id. § 1677a(f)(2)(D). The statute defines

the total expenses as:

> (C) Total expenses
>
> The term "total expenses" means all expenses in the first of the
> following categories which applies and which are incurred by or on
> behalf of the foreign producer and foreign exporter of the subject
> merchandise and by or on behalf of the United States seller affiliated
> with the producer or exporter with respect to the production and sale of
> such merchandise:
>
>> (i) The expenses incurred with respect to the subject merchandise
>> sold in the United States and the foreign like product sold in the
>> exporting country if such expenses were requested by the
>> administering authority for the purpose of establishing normal
>> value and constructed export price.
>>
>> (ii) The expenses incurred with respect to the narrowest category
>> of merchandise sold in the United States and the exporting
>> country which includes the subject merchandise.
>>
>> (iii) The expenses incurred with respect to the narrowest category
>> of merchandise sold in all countries which includes the subject
>> merchandise.

Id. § 1677a(f)(2)(C).

In calculating constructed export price, Commerce utilized the same data

that it used to calculate the constructed value profit, the Tenaris and TMK 2018

financial statements.  See Final IDM at 106; SeAH Prelim. Calculations Mem. at 3.

Commerce determined that SeAH did not have a viable home market and,

therefore, did not have a viable comparison market.  See Final IDM at 106; SeAH

Prelim. Calculations Mem. at 3.  As a result, Commerce determined that relying on

SeAH's financial statements was "unsuitable" and relied on the Tenaris and TMK

2018 financial statements.  See Final IDM at 106; SeAH Prelim. Calculations

Mem. at 3.

SeAH argues that Commerce is required by statute to use SeAH's own

information.  See SeAH's Br. at 33–35.  Commerce asserted that the statute "does

not require Commerce to rely upon a company's own financial data when using

constructed value for the home market."  Final IDM at 106.  Defendant reiterates

this assertion and argues that Commerce may rely on financial statements on the

record when the comparison market is not viable.  Def.'s Resp. at 31.

Under 19 U.S.C. § 1677b(e)(2)(B)(i)–(iii), Commerce may, when

appropriate, use "any other reasonable method" to determine profits for

constructed value.  The Court observes that no such "any other reasonable method"

provision exists under section 1677a for constructed export price.  Section 1677a,

covering export price and constructed export price, refers to data from "the foreign producer, exporter, and affiliated parties." 19 U.S.C. § 1677a(d). Unlike the constructed value provision in section 1677b, section 1677a contains no language concerning the use of data from producers of comparable merchandise. Despite the absence of such a provision, the U.S. Court of Appeals for the Federal Circuit has upheld the use of surrogate values to adjust constructed export price under section 1677a. See SeAH Steel VINA Corp. v. United States, 950 F.3d 833, 838 (Fed. Cir. 2020) (citing 19 U.S.C. § 1677a(c)(2)(A)) (stating that Commerce may adjust constructed export price using surrogate values when the exporting country is a non-market economy).

        Section 1677a(f)(2)(C) provides that the first applicable category of three listed categories is to be used to determine total expenses. 19 U.S.C. § 1677a(f)(2)(C). The first category provides for the use of expenses "requested by [Commerce] for the purpose of establishing normal value and constructed export price." Id. The Court notes that Commerce calculated a constructed value and did not use SeAH's expenses to establish normal value, because Commerce determined that SeAH's home-market and third-country sales were non-viable. See Final IDM at 71. Commerce determined, therefore, that use of the second category was appropriate. Id. at 106. Under the second category, the Statement of Administrative Action instructs that the information is obtained through financial

reports.  See SAA at 825, reprinted in 1994 U.S.C.C.A.N. at 4164.  The Court

notes that neither the SAA nor section 1677a contain language requiring the use of

a company's own financial data or prohibiting the use of data from producers of

comparable merchandise.  See id.; 19 U.S.C. § 1677a(d).  Accordingly, the Court

holds that Commerce is permitted under the statute to use surrogate data to

calculate constructed export price and, inherently, constructed export price profit

rates.

The Court holds that Commerce's determination to use the Tenaris and

TMK 2018 financial statements to calculate SeAH's constructed export price profit

rate, instead of SeAH's own information, is in accordance with the law.  The Court

sustains Commerce's constructed export price profit rate determination.

## VII.   Exclusion of Freight Revenue Profit

Commerce capped the deduction for freight expenses at the amount actually

incurred.  Final IDM at 109–11.  SeAH asserts that Commerce's determinations

that separately-invoiced freight revenue are included in the price of the

merchandise and that the portion of freight revenue up to actual freight expenses,

but not exceeding actual freight expenses, is included in the price of the

merchandise, are contrary to the law.  SeAH's Br. at 20–21.  SeAH argues that

Commerce must treat freight profits and losses uniformly, either ignoring both or

including both.  Id. at 21.

Export price or constructed export price is the price at which the subject

merchandise is first sold in the United States.  See 19 U.S.C. § 1677a(a), (b).

Under 19 U.S.C. § 1677a(c)(2)(A),

> [t]he price used to establish export price and constructed export price
> shall be reduced by . . . the amount, if any, included in such price,
> attributable to any additional costs, charges, or expenses, and United
> States import duties, which are incident to bringing the subject
> merchandise from the original place of shipment in the exporting
> country to the place of delivery in the United States . . . .

Id. § 1677a(c)(2)(A).  Commerce uses adjustments when calculating export price

or constructed export price "to achieve 'a fair, apples-to-apples comparison'

between U.S. price and foreign market value." Fla. Citrus Mut. v. United States,

550 F.3d 1105, 1110 (Fed. Cir. 2008) (quoting Torrington Co. v. United States, 68

F.3d 1347, 1352 (Fed. Cir. 1995)).  Such adjustments prevent exporters from

improperly inflating the export price of a good by charging a customer for freight

more than the exporter's actual freight expenses.  See Dongguan Sunrise Furniture

Co. v. United States, 36 CIT 860, 894 (2012).  Commerce adjusts its price

calculation using net freight revenue, and it is reasonable for Commerce not to

consider freight revenue profit as part of the price of the subject merchandise in

accordance with the statutory language.  See id. at 894–95.

Here, Commerce determined that increasing the merchandise gross unit

selling price with profit SeAH earned on the sale of freight would artificially

inflate the constructed export price.  See Final IDM at 110–11.  Commerce isolated

the price of SeAH's merchandise alone without any additional charges by capping

SeAH's freight expenses at the actual cost incurred in order to exclude freight

revenue profit.  Id.

SeAH contends that Commerce's treatment of freight revenue below the cap

as part of the U.S. price in its calculations, and freight revenue above the cap as not

part of the U.S. price in its calculations, is inconsistent with the statute.  See

SeAH's Br. at 20–21.  SeAH argues that, under the language of 19 U.S.C.

§ 1677a(c)(2)(A), Commerce "may deduct freight costs only if freight is included

in the price that Commerce uses as the starting point of its calculations."  Id. at 21

(emphasis omitted).  SeAH also argues that the statute allows Commerce to include

all freight revenue and costs in the price or none of the freight revenue and costs in

the price, but does not allow Commerce to include only a part of the freight

revenue in the price.  Id.  This is an incorrect reading of the statute.  Section 1677a

requires Commerce to make adjustments when calculating export price or

constructed export price "to achieve a fair, apples-to-apples comparison between

U.S. price and foreign market value."  Fla. Citrus Mut., 550 F.3d at 1110 (citation

and internal quotation marks omitted); see 19 U.S.C. § 1677a(c)(2)(A).  A proper

"apples-to-apples" comparison between the U.S. price and foreign market value

would not include profit earned from freight rather than from the sale of subject

merchandise.  Because a proper comparison would not include profit earned from freight rather than from the sale of subject merchandise, the Court concludes that Commerce's exclusion of freight revenue profit reflects the statutory method and is in accordance with the law.

## CONCLUSION

For the foregoing reasons, the Court sustains in part and remands in part Commerce's <u>Final Results</u>.

The Court sustains the following determinations of Commerce:

1.      The Court sustains Commerce's constructed export price profit rate as in accordance with the law; and

2.      The Court sustains Commerce's exclusion of freight revenue profit as in accordance with the law.

The Court remands the following determinations of Commerce:

1.      The Court remands for Commerce to further explain or reconsider its use of the Cohen's *d* test in its differential pricing analysis; and

2.      The Court remands for Commerce to further explain or reconsider its particular market situation determination.

Accordingly, it is hereby

**ORDERED** that the <u>Final Results</u> are remanded to Commerce for further proceedings consistent with this opinion; and it is further

**ORDERED** that this case will proceed according to the following schedule:

1.      Commerce shall file the remand results on or before December 17, 2021;

2.      Commerce shall file the remand administrative record on or before January 14, 2022;

3.      Comments in opposition to the remand results shall be filed on or before February 11, 2022;

4.      Comments in support of the remand results shall be filed on or before March 4, 2022; and

5.      The joint appendix shall be filed on or before March 25, 2022.


                                                    /s/  Jennifer Choe-Groves
                                                    Jennifer Choe-Groves, Judge

Dated:    October 19, 2021
          New York, New York