**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE:  THE HONORABLE JENNIFER CHOE-GROVES, JUDGE**

| | |
|---|---|
| SEAH STEEL CORPORATION, | ) |
| Plaintiff, | ) |
| v. | ) |
| UNITED STATES, | ) |
| Defendant, | ) Court. No. 20-00150 |
| AND | ) |
| UNITED STATES STEEL CORPORATION, *ET AL.*, | ) |
| Defendant-Intervenors. | ) |

<u>**UNITED STATES STEEL CORPORATION'S COMMENTS IN OPPOSITION TO
REMAND REDETERMINATION**</u>

Thomas M. Beline
Myles S. Getlan
James E. Ransdell
CASSIDY LEVY KENT (USA) LLP
900 19th Street, N.W.
Suite 400
Washington, D.C. 20006
(202) 567-2300

*Counsel to United States Steel Corporation*

March 21, 2022

## Table of Contents

Page

I.      STATEMENT OF FACTS ..................................................................................3

    A.      Commerce Considered that "Particular" Had Been Redefined by the
        *Remand Order* in Extremely Narrow Terms .........................................................4

    B.      Commerce Considered that the *Remand Order* Required Strict
        Contemporaneity with the Period of Review ....................................................5

    C.      Commerce Erroneously Deferred to the Court's *Sua Sponte* Observations
        Regarding KEPCO As Controlling Commerce's Electricity Analysis...................7

II.     ARGUMENT ...................................................................................................8

    A.      Standard of Review.............................................................................................8

    B.      *NEXTEEL* Eliminates Certain Analytical Restrictions that Commerce
        Imposed Upon its *Remand Results* ...................................................................9

        1.      The Definition of "Particular" That Limited the *Remand Results* Is
            Unlawful ...............................................................................................10

        2.      *NEXTEEL* Rejected the USCIT's "Temporal Problem" Analysis.............14

        3.      Commerce May Have Misunderstood the *Remand Order*, But
            Because the Restrictions in Question Are Proscribed, it Is Not
            Necessary to Reach this Issue .................................................................17

    C.      Commerce's Construction of the Court's *Remand Order* Affected
        Commerce's Analysis of Four PMS Factors; Insofar as the Court May Not
        Supplant Commerce as Decision-Maker, Further Remand Is Required...............18

        1.      HRC Imports: Commerce Incorrectly Preempted the Court's
            Substantial Evidence Review..................................................................20

        2.      Subsidization and Government Restructuring:  Commerce
            Conflated Distinct Pieces of Evidence and Uncritically Adopted
            Errors from the *Remand Order* ..............................................................22

        3.      Electricity:  The Court Cannot Find Facts *De Novo*; Commerce
            Unlawfully Treated *Dicta* as Binding Precedent in Evaluating
            Electricity Market Distortions.................................................................25

III.    CONCLUSION ...........................................................................................29

## Table of Authorities

Page(s)

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i)...........................................................................8

19 U.S.C. § 1677b(a)(1)(B)(ii)(III)..................................................................11

19 U.S.C. § 1677b(a)(1)(C)(III)......................................................................11

19 U.S.C. § 1677b(a)(4)(e)........................................................................14, 28

19 U.S.C. § 1677b(e) ............................................................................... *passim*

**Regulations**

19 C.F.R. § 351.102(b)(21).............................................................................24

19 C.F.R. § 351.301(c)(5)................................................................................24

19 C.F.R. § 351.301(c)(5)(ii)..........................................................................24

**Court Decisions**

*Ad Hoc Shrimp Trade Action Comm. v. United States,*
515 F.3d 1383 (Fed. Cir. 2008)................................................................18, 19

*Atl. Sugar, Ltd. v. United States,*
744 F.2d 1556 (Fed. Cir. 1984).............................................................8, 14, 28

*Changzhou Trina Solar Energy Co. v. United States,*
466 F. Supp. 3d 1287 (Ct. Int'l Trade 2020) ...................................................19

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,*
467 U.S. 837 (1984).........................................................................................13

*Coal. of Am. Flange Prods. v. United States,*
2021 Ct. Intl. Trade LEXIS 58 (Ct. Int'l Trade May 13, 2021)......................14

*Consol. Edison Co. v. NLRB,*
305 U.S. 197 (1938).........................................................................................8

*Fujitsu Gen. Ltd. v. United States*,
88 F.3d 1034 (Fed. Cir. 1996) ................................................................................8

*Icon Health & Fitness, Inc. v. Strava, Inc.*,
849 F.3d 1034 (Fed. Cir. 2017) ............................................................................24

*Jinxiang Hejia Co. v. United States*,
35 C.I.T. 1190 (2011) ............................................................................................19

*Kearns v. Chrysler Corp.*,
32 F.3d 1541 (Fed. Cir. 1994) ..........................................................................9, 18

*Nakornthai Strip Mill Public Co. Ltd. v. United States*,
587 F. Supp. 2d 1303 (Ct. Int'l Trade 2008) ..........................................................9

*NEXTEEL Co., Ltd. v. United States*,
450 F. Supp. 3d 1333 (Ct. Int'l Trade 2020) ..................................................15, 16

*NEXTEEL Co., Ltd. v. United States,*
2022 U.S. App. LEXIS 6325 (Fed. Cir. Mar. 11, 2022) ................................. *passim*

*Nippon Steel Corp. v. Int'l Trade Comm'n*,
345 F.3d 1379 (Fed. Cir. 2003) ......................................................................18, 19

*Norgren Inc. v. Int'l Trade Comm'n*,
699 F.3d 1317 (Fed. Cir. 2012) ......................................................................25, 26

*Res-Care, Inc. v. United States*,
735 F.3d 1384 (Fed. Cir. 2013) ............................................................................13

*SeAH Steel Corp. v. United States*, 539 F. Supp. 3d 1341 (Ct. Int'l Trade
2021) .............................................................................................................. *passim*

*Tai Shan City Kam Kiu Aluminium Extrusion Co. v. United States*,
125 F. Supp. 3d 1337 (Ct. Int'l Trade 2015) ..........................................................9

*Trent Tube Div., Crucible Materials Corp. v. Avesta Sandvik Tube AB*,
975 F.2d 807 (Fed. Cir. 1992) ..............................................................................25

*Union Camp Corp. v. United States*,
53 F. Supp. 2d 1310 (Ct. Int'l Trade 1999) ..........................................................19

*Universal Camera Corp. v. NLRB*,
340 U.S. 474 (1951) ................................................................................................8

*Vicentin S.A.I.C. v. United States,*
466 F. Supp. 3d 1227 (Ct. Int'l Trade 2020) ...................................................................14

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.,*
435 U.S. 519 (1978)..........................................................................................................18

**Administrative Determinations**

*Certain Cut-to-Length Carbon-Quality Steel Plate Products from Korea*,
83 Fed. Reg. 32,840 (July 16, 2018).................................................................................24

*Certain Cut-to-Length Carbon-Quality Steel Plate Products from Korea,*
84 Fed. Reg. 42,893 (Aug. 19, 2019).................................................................................24

*Certain Cut-to-Length Carbon-Quality Steel Plate Products from Korea,*
85 Fed. Reg. 84,296 (Dec. 28, 2020)..................................................................................24

**Other Legislative Materials**

S. Rept. 114-45 (2015)........................................................................................................12

161 Cong. Rec. H4655 (June 25, 2015)..............................................................................12

161 Cong. Rec. S2897 (May 14, 2015) ........................................................................12, 13

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE:  THE HONORABLE JENNIFER CHOE-GROVES, JUDGE**

| | |
|---|---|
| SEAH STEEL CORPORATION, ) | |
| Plaintiff, ) | |
| v. ) | |
| UNITED STATES, ) | Court. No. 20-00150 |
| Defendant, ) | |
| AND ) | |
| UNITED STATES STEEL CORPORATION, *ET AL.*, ) | |
| Defendant-Intervenors. ) | |

**UNITED STATES STEEL CORPORATION'S COMMENTS IN PARTIAL
OPPOSITION TO REMAND REDETERMINATION**

This proceeding returns to the Court after the U.S. Department of Commerce

("Commerce"), in respectful protest, reversed its underlying administrative determination by

reasoning that the Court's *Remand Order* imposed analytical restrictions that precluded the

alternative pathways by which Commerce could conclude that a particular market situation

("PMS") existed in Korea during the period of review.  *SeAH Steel Corp. v. United States*,

USCIT Ct. No. 20-00150, Slip Op. 21-146, ECF Doc. No. 70, 539 F. Supp. 3d 1341 (Ct. Int'l

Trade Oct. 19, 2021) (the "*Remand Order*").  While repeatedly expressing its conviction that a

PMS did in fact exist in Korea during the review period, Commerce's *Remand Results*, *see* ECF

No. 80-1 (Jan. 24, 2022),[1] nevertheless avoided finding such a PMS by construing the *Remand*

---

[1] Citations to the record take the form "C.R." and "P.R." for the confidential and public versions
of the administrative record, *see* ECF Doc. Nos. 20-1, 20-2, and "C.R.R." and "P.R.R." for the
confidential and public versions of the remand record, *see* ECF Doc. Nos. 117-1, 117-2.

*Order* as imposing extremely strict bright line rules with respect to the "particularity" of market distortions and the contemporaneousness of record evidence with the review period.

Subsequent to Commerce filing its *Remand Results* with the Court, the U.S. Court of Appeals for the Federal Circuit ("Federal Circuit") issued its opinion in *NEXTEEL Co., Ltd. v. United States*, vacating this Court's disposition of Commerce's PMS finding in the second administrative review of this antidumping order. *See NEXTEEL Co., Ltd. v. United States*, CAFC Consol. Ct. No. 21-1334, -1430, 2022 U.S. App. LEXIS 6325 (Fed. Cir. Mar. 11, 2022) at 21-22 ("*NEXTEEL*") (precedential decision not yet published in F. 4th). *NEXTEEL* governs this action as the Federal Circuit reviewed U.S. Court of International Trade ("USCIT") opinions that applied largely the same analytical approach as the *Remand Order*, and in general *NEXTEEL* interprets the same legal provisions applied by Commerce here on remand. Crucially, rather than replicate or affirm the USCIT's analysis of any PMS factor, *NEXTEEL* instead set forth "modified reasoning" at odds with the very bright line rules that constrained Commerce's *Remand Results*. *See NEXTEEL* at 3, 7-16. Because Commerce's *Remand Results* adhere to strictures that contravene the Federal Circuit's analysis in *NEXTEEL*, remand is necessary for Commerce to render a PMS determination unencumbered by those unlawful restrictions. (Section II.B). Separately, in several instances Commerce unlawfully abdicated its statutory responsibility to find facts in the first instance, variously conflating evidence considered by the *Remand Order* with evidence newly discussed on remand (Section II.C.1), uncritically adopting the *Remand Order*'s statements of fact that are contradicted by the record (Section II.C.2), and treating the Court's *sua sponte* findings of fact as binding (Section II.C.3).

Given these errors, the Court must again remand Commerce's *Remand Results* so that Commerce can fulfill the statutory mandates to issue a determination in accordance with law and

supported by substantial evidence, unconstrained by strictures that the Federal Circuit found to be unlawful.

## I.     STATEMENT OF FACTS

Commerce recognized that the *Remand Order* "did not issue a directed verdict by expressly ordering Commerce to reverse its PMS finding."  *Remand Results* at 12.  Although Commerce ostensibly had broad discretion, Commerce expressly and pointedly restricted its rationale and conclusions based on its understanding of the analytical constraints found in the *Remand Order*.  *See, e.g.*, *Remand Results* at 12 ("Our remand determination, including any explanation that we may provide, must be consistent with the Court's opinion, even though we disagree with the Court's reasoning and conclusions."); *see also id.* at 25 ("We have reached this finding because of the constraints that the Court's opinion imposed on us with which we respectfully disagree.").  Commerce's conclusion was as follows:

> Based on the current evidentiary record and the constraints imposed on us by the Court's ruling, we find an insufficient evidentiary basis to sustain an affirmative PMS finding in this administrative review, consistent with the Court's opinion.  **To be clear, we believe that the Court's approach to this evidence is flawed – we believe, and our final results of review demonstrated, that each document should be evaluated as it relates to the POR at issue; we also believe that the record contains sufficient evidence to demonstrate the totality of circumstances sufficient to support Commerce's finding of a PMS in Korea**.

*Remand Results* at 7 (emphasis supplied).[2]  Importantly, neither Commerce's Draft Remand Results, nor the "Analysis" section of Commerce's *Remand Results* discussed the administrative

---

[2] Commerce did not address the differential pricing issue, finding that it was mooted by Commerce's recalculation of a *de minimis* weighted-average dumping margin for SeAH.  *See Remand Results* at 26-27.  To the extent Commerce's PMS determination warrants further reconsideration, the differential pricing issue may again become relevant.

record anew, or elucidated exactly how the record evidence could be understood to support a negative PMS finding. *See generally* Draft Remand Results (Dec. 10, 2021) (P.R.R. 1); *Remand Results* at 5-7.

Nevertheless, in response to U. S. Steel's comments on Commerce's Draft Remand Results, Commerce discussed certain specific record evidence and detailed particular ways in which Commerce understood the *Remand Order* to restrict Commerce's analytical discretion. *See Remand Results* at 11-25. Commerce determined that its "ability to weigh the evidence regarding the particular market situation issue has been severely constrained by the Court's reasoning in its opinion," *id.* at 12, in the following three major ways.

## A. Commerce Considered that "Particular" Had Been Redefined by the *Remand Order* in Extremely Narrow Terms

Commerce stated: "the Court has narrowed the statutory term 'particular' to require that each individual distortion be wholly 'unique' to the market in question, apparently precluding Commerce from finding a particularity based on the combination of distortions found in the Korean market, or any single factor that might be present in other markets, even to a much lesser degree." *Id.* at 12. Commerce expressly disagreed with this interpretation of the statutory term "particular." *Id.* at 19 ("even if an individual facet of a PMS may not be particular to a market, the cumulative effect of the interplay between the individual facets may be particular"). Nevertheless, Commerce found itself constrained to conform to the Court's rationale. In Commerce's view, this prevented Commerce from finding that large volumes of low-priced hot-rolled steel coil ("HRC") imports had contributed to Korea's PMS. Commerce acknowledged evidence

> that relates to the average unit value of Chinese HRC sold in Korea, which falls in the bottom 15 percent of 160 destinations for Chinese exports, as well as statements by the Korean Iron and Steel Association, which described the reasons behind the Korean

> government's decision not to counteract unfair trade practices by
> China out of fear of retaliation against Korean steel companies that
> have moved to China, as well as adjustment of prices by Korean
> steel cartels.

*Remand Results* at 18-19.  Although none of the foregoing factual points were discussed in the

Court's *Remand Order*, *see Remand Order* at 24-25, Commerce nevertheless found "the Court's

reasoning that effects of Chinese steel imports are insufficient to establish the existence of a

PMS in Korea because the effects of global overcapacity are world-wide" to preclude any of the

foregoing facts from establishing that low-priced HRC imports contributed to Korea's PMS.

*Remand Results* at 19.

### B. Commerce Considered that the *Remand Order* Required Strict Contemporaneity with the Period of Review

Commerce understood that "the Court has imposed a strict contemporaneity requirement

with respect to distortion based on subsidization and government restructuring that completely

discounts pre- and post-POR evidence." *Id.* at 14; *see also, e.g.*, *id.* at 17 ("The Court made it

clear that it was unreasonable for Commerce to rely on evidence that was not contemporaneous

with the POR."); *id.* at 19-20 (discussing this restriction in relation to the strategic alliances

factor).  In Commerce's mind, this restriction precluded any PMS finding with respect to

subsidization, strategic alliances, or government restructuring if such distortions were created

prior to — but persisted during — the period of review.

*First*, with respect to HRC subsidies, Commerce noted the complete absence of

"evidence on the record that the subsidies were terminated during the POR and that the flow of

the benefits has ceased." *Id*. at 17.  *Next*, with respect to strategic alliances, Commerce

recognized "that, as a practical matter, it would be difficult, if not impossible, to uncover the

evidence of price fixing activity during the POR, because corporations involved in illegal price

fixing schemes are likely to make efforts to conceal them and it may take years for such activity

to be brought to light." *Id.* at 20.  Commerce found record evidence that "the Korean government took fourteen years to uncover and investigate longstanding recent cartel practices and the repeated involvement of four OCTG respondents therein," and further acknowledged U. S. Steel's representation that uncovering such evidence on the Court's apparent timeline was a "practical impossibility." *Id.* at 20.  Commerce found that price fixing "can have effects which may stretch out for long periods of time—far beyond the periods of review in which the strategic alliances were first established or in effect." *Id.* at 19-20.  *Finally*, Commerce opened its analysis of Korean government restructuring of the steel industry by observing that the Court's "contemporaneity standard is especially limiting in regard to subsidies and government restructuring programs, where the effects of such programs may materialize over time." *Id.* at 23.  Commerce found "evidence of actual restructuring efforts affecting major OCTG inputs mere months before the POR." *Id.* at 24.  Commerce further observed that "{t}he nature of this restructuring—upgrading a blast furnace—would result in the effects of this restructuring being present during the POR, even if the initial restructuring (and any GOK assistance provided to support it) occurred slightly before the POR." *Id.* at 24.  Importantly, this particular instance of restructuring concerned POSCO.  *See* PMS Allegation at Exs. 87-88 (C.R. 201).

Yet, in Commerce's view, the Court's strict contemporaneity requirement precluded Commerce from finding that any of the foregoing contributed to the existence of a PMS.  For example, Commerce concluded that because the Court had mandated "evidence of actual restructuring and government interference *during the period of review*," and because "the Court has already found that 'the record does not indicate that Hyundai Steel actually took advantage of restructuring efforts during the period of review, and Hyundai Steel asserts that it did not take

advantage of restructuring efforts,'" Commerce was constrained to not find any contribution to the existence of a PMS. *Id.* at 24.

C.    **Commerce Erroneously Deferred to the Court's *Sua Sponte* Observations Regarding KEPCO As Controlling Commerce's Electricity Analysis**

Commerce understood the Court to have "identified three circumstances that could potentially establish the existence of particular market situation: (1) evidence of countervailable subsidies; (2) evidence of subsidies (of any kind); and (3) evidence that prices are not competitively set." *Id.* at 21. Commerce's analysis "was centered on {the third of these, *i.e.,*} whether government control over electricity pricing was preventing prices from being competitively set…." *Id.* at 22. Commerce stated that the Court "offered its own explanation that Korea Electric Power Corporation (KEPCO)'s operating losses were due to increased environmental and renewable energy costs, warmer winter weather, and higher natural gas prices. To be clear, Commerce did not make these factual findings." *Id.* at 14. Nor, for that matter, did SeAH ever advance any such argument before the Court in challenging the PMS determination. *See* Opening Brief of SeAH Steel Corp., Ct. No. 21-150, ECF Doc. 44-1 (Dec. 14, 2020) at Attachment at 5-6.

On remand, Commerce exercised its authority to conclude that it did not find the Court's *de novo* fact finding convincing. Commerce stated that "the Court does not explain why KEPCO did not change its pricing scheme in light of increased environmental and renewable energy costs, warmer winter weather, and higher natural gas prices or any other factor affecting the cost or price as one would expect in a situation when prices are competitively set." *Remand Results* at 14-15. Commerce continued by noting that *cost* drivers were only part of the lossmaking equation, "Commerce further analyzed why KEPCO did not raise prices to avoid operating losses. The record evidence demonstrates that '{n}o cross- sector {electricity} tariff increase has

been implemented since November 2013,' which calls into question the notion that KEPCO's prices have been competitively set." *Id.* at 15.  Finally, Commerce noted additional "evidence…on the record that demonstrates that electricity prices are not competitively set," in particular "statements from KEPCO's CEO that supports the determination that the GOK's control of the electricity market distorted pricing." *Id.* at 22 (citing USS Draft Remand Comments at 11 (C.R.R. 5)).  Nevertheless, Commerce found the Court "has already determined that similar quotations from KEPCO's Form 20-F and several new{s} articles do not support a determination that the Korean Government's regulation of the electricity market contributed to a PMS," and that Commerce was therefore prevented from finding any contribution to a PMS.  *Id.* at 22-23.

## II.    ARGUMENT

### A.    Standard of Review

The Court must remand any redetermination on remand that is "unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i); *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1038 (Fed. Cir. 1996). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938).  The Federal Circuit has long held that substantial evidence requires that the agency's determination "tak{e} into account the *entire record*, including whatever fairly detracts from the substantiality of the evidence."  *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984) (emphasis supplied); *see also Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951) ("{t}he substantiality of evidence must take into account whatever in the record fairly detracts from its weight.").  Nevertheless, a court undertaking substantial evidence review is not a venue in which

parties may retry factual issues *de novo*.  *See Kearns v. Chrysler Corp.*, 32 F.3d 1541, 1548 (Fed. Cir. 1994).

In addition, "Commerce's results in its redetermination pursuant to court remand are also reviewed for 'compliance with the court's remand order.'"  *Tai Shan City Kam Kiu Aluminium Extrusion Co. v. United States*, 125 F. Supp. 3d 1337, 1341 (Ct. Int'l Trade 2015) (quoting *Nakornthai Strip Mill Public Co. Ltd. v. United States*, 587 F. Supp. 2d 1303, 1306 (Ct. Int'l Trade 2008)).

### B.   *NEXTEEL* Eliminates Certain Analytical Restrictions that Commerce Imposed Upon its *Remand Results*

Remand is required because Commerce understood the *Remand Order* as imposing certain restrictions that determined the outcome of Commerce's remand analysis.  Yet, the Federal Circuit rejected these very restrictions in *NEXTEEL*.[3]  Specifically, Commerce's understanding of the extremely narrow definition of "particular" imposed upon it is incompatible with *NEXTEEL*, as is Commerce's assumption that pre- and post-POR evidence must be disregarded.  Whether or not these limitations were in fact intended by the *Remand Order*, they are incompatible with the Federal Circuit's analysis in *NEXTEEL*. Commerce's remand analysis–

---

[3] Although *NEXTEEL* diverges from the *Remand Order* in additional ways, U. S. Steel limits these comments to the examples most relevant to Commerce's analysis in its *Remand Results*. For example, Commerce's *Remand Results* deviated from Commerce's past practice and dictated that a "second step" was required by 19 U.S.C. § 1677b(e), *see Remand Results* at 18, but *NEXTEEL* rejected this interpretation, *see NEXTEEL* at 8.  Specifically, what Commerce now treats as a "second step," *NEXTEEL* instead considered "factual support" for the PMS finding itself, *viz.*, the market situation must concern production costs (rather than subject merchandise sales prices) and not be ordinary, *e.g.*, an "ongoing global phenomenon" "alone."  *NEXTEEL* at 8.  Nevertheless, because Commerce considered this "second step" to have been satisfied, *see Remand Results* at 18, although it should not have been required in the first place, there is no need for the Court to address this issue at this time.

–including the subsidization, HRC imports, strategic alliances, and government restructuring factors—is thus unlawful and unsupported by substantial evidence.

### 1.  The Definition of "Particular" That Limited the *Remand Results* Is Unlawful

A "particular market situation" must, of course, be "particular."  *See, e.g.*, *NEXTEEL* at 8. The precise contours of *what exactly* must be "particular" and *exactly how* "particular" it must be are, however, often outcome determinative.  On these points, Commerce's *Remand Results* concluded that:

> the Court has narrowed the statutory term 'particular' to require that each individual distortion be wholly 'unique' to the market in question, apparently precluding Commerce from finding a particularity based on the combination of distortions found in the Korean market, or any single factor that might be present in other markets, even to a much lesser degree.

*Remand Results* at 12 (internal quotation marks omitted).  As explicated by Commerce, the USCIT-imposed narrowing of what it means for a "market situation" to be "particular," has two aspects:  (1) each individual facet of the "market situation" must be "particular," and (2) in order for a facet to be "particular," it must be wholly unique.  Neither is compatible with *NEXTEEL*.

As for the first limitation, *NEXTEEL* considered "particularity" to concern the "market situation" as a whole, not each individual factor.  This is consistent with Commerce's analytical approach in the Final IDM.  *See* Final IDM at 25 (finding that "the allegations represent facets of a single PMS" and weighing whether their cumulative effects were "particular") (P.R. 347); *Remand Results* at 19 ("even if an individual facet of a PMS may not be particular to a market, the cumulative effect of the interplay between the individual facets may be particular"); *see also* Final IDM at 31 (analyzing particularity with respect to a confluence of government subsidization and restructuring) (P.R. 347).  Indeed, insofar as "particular" modifies "market

situation" and not "individual distortion," this is the only possible interpretation the statute allows.

The Federal Circuit uses the plural form in stating that "the circumstance**s** supporting a 'particular' market situation…must be 'particular'…." *NEXTEEL* at 8 (emphasis supplied). The Federal Circuit never says, for example, "each circumstance" or "a circumstance" or "every circumstance" or "must each be particular." *See id.* To drive this point home, *NEXTEEL* states with respect to market distortions attributable to steel imports that these "**could contribute to** a particular market situation, {but} the record does not show sufficient particularity for this circumstance to create a particular market situation **on its own**." *NEXTEEL* at 14 (emphasis supplied).[4] Were particularity required of each individual factor, *NEXTEEL* would have stated that non-particularized steel import distortions could *not* contribute to the particular market situation. Instead, *NEXTEEL* stated the opposite, and furthermore confirmed Commerce's continued discretion to justify the particular market situation "based on any subset of the factors or other reasoning." *NEXTEEL* at 22.

Turning to the second limitation, *NEXTEEL* does not consider the statutory term "particular" to require that the "market situation" (or the individual distortions contributing to that market situation) be wholly unique or one-of-a-kind. Nor, as is clear from the Final IDM,

---

[4] Consistent with the above, *NEXTEEL* additionally states that "{a}n ongoing global phenomenon would not **alone** constitute a deviation from the 'ordinary course of trade.'" *NEXTEEL* at 8 (emphasis supplied). Per the Federal Circuit, subject merchandise production costs (as opposed to subject merchandise sales prices) being outside the "ordinary course of trade" (as opposed to distorted in some universal fashion) is "factual support" required of a particular market situation under 19 U.S.C. § 1677b(e). *See id.*; *see also* 19 U.S.C. §§ 1677b(a)(1)(B)(ii)(III), (a)(1)(C)(III) (omitting this language with respect to particular market situations affecting subject merchandise sales prices and focusing instead on the comparability with U.S. price). In other words, *NEXTEEL* reasons that a 19 U.S.C. § 1677b(e) "market situation" should be cost-related and to be "particular" it should not be "ordinary," *i.e.*, "global," in its entirety. *See NEXTEEL* at 8.

does Commerce.  *See, e.g.*, *Remand Results* at 18-19 (juxtaposing Commerce's original analysis

with the narrow particularity standard imposed by the USCIT).  While *NEXTEEL* does not define

"particularity," *NEXTEEL*'s analysis demonstrates that nothing in the plain statutory language

requires an exacting standard such as one-of-a-kind.  Instead, the market situation must be

"'particular' to producers of the subject merchandise during the relevant period." *NEXTEEL* at

8.  In discussing domestic subsidies, *NEXTEEL* described the relevant question as follows:

whether it "affected Korean OCTG producers *any more than* OCTG producers elsewhere."

*NEXTEEL* at 11 (emphasis supplied).  Plainly, any distortion whose effect is felt by Korean

OCTG producers "more than" it is felt by other OCTG producers is not wholly unique to Korean

OCTG producers.  This is consistent with Congress' overarching intent "that where a particular

market situation exists that distorts pricing or cost…Commerce has flexibility in calculating a

duty that is not based on distorted pricing or costs."  S. Rept. 114-45 (2015) at 37.[5]  At a bare

---

[5] Additional legislative history supports this understanding.  During House floor debates, Representative Meehan specifically stated that Title V would "give{ Commerce} the kind of discretion to be able to look at the facts and to take recalcitrant countries and hold them accountable by creating what is accurate" – *i.e.*, undistorted – and that Commerce "will be empowered to…disregard prices or costs of inputs that foreign producers purchase if {it} has reason to believe or suspects that the inputs in question have been subsidized or dumped."  161 Cong. Rec. H4655, H4690 (June 25, 2015).  This is consistent with all other statements concerning Title V in the House.  *See id*. at H4695 (Rep. Jackson Lee) (praising the PMS provision for "allowing…Commerce to use a different calculation methodology to compare domestic and foreign costs if the methodology does not produce an appropriate comparison"); *id.* at H4697 (Rep. Ryan) ("when another country…dump{s} product into our market, we ought to be able to do something about it.  So there is a bipartisan acknowledgment on that front…").

In the Senate, Senator Brown specifically invoked the example of Korean OCTG as a focus of Title V.  161 Cong. Rec. S2897, S2900 (May 14, 2015) ("Imports for OCTG…have doubled since 2008….Korea has one of the world's largest steel industries, but get this, not one of these pipes that Korea now dumps in the United States—illegally subsidized—is ever used in Korea for drilling because Korea has no domestic oil or gas production.  In other words, Korea has created this industry only for exports and has been successful because they are not playing fair.  So their producers are exporting large volumes to the United States, the most open and attractive market in the world, at below-market prices. That is clear evidence that our workers and manufacturers are being cheated, and it should be unacceptable to the Members of this body.  It

minimum, *NEXTEEL* confirms that the precise meaning of the statutory term "particular" is ambiguous, meaning that Commerce's more flexible interpretation of the term is owed deference under *Chevron* Step Two.  *See Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842-43 (1984).  *See* U. S. Steel Opening Brief, ECF Doc. 50 (Feb. 26, 2021) at 6, 13, 26-29 (arguing same); USS Draft Remand Comments at 14 (same).[6]

Because the extreme interpretations of "particular" that Commerce believed to have been imposed upon it by the *Remand Order* are contrary to the Federal Circuit's analysis in *NEXTEEL*, Commerce's remand analysis is not in accordance with law and its negative conclusions with respect to distortions that ran afoul of the extreme interpretations of "particular" are likewise unsupported by substantial evidence.  For example, Commerce's conclusion that the distortive effect of HRC imports was insufficiently particular to contribute to a PMS was the result of both of the restrictions indicated above.  *See Remand Results* at 18-19; *see also* Section II.C.1, *infra* (describing additional factual evidence related to the "particularity" of this factor that Commerce assumed it was precluded from relying upon).  Removing either of the two "particularity" restrictions in line with *NEXTEEL* would render this factor a viable component of the PMS analysis.  *See Remand Results* at 18-19 (noting ways in which the Korean

---

hurts our workers, our communities, and our country.  It is time to stop it.").  Senator Wyden stated that Title V "is about guaranteeing that the United States has a queen on the chess board, no matter what competitive tactic it faces."  *Id.* at S2902.

[6]  This more flexible reading is supported by dictionary definitions.  "Particular (adj)," Merriam-Webster Online Dictionary, www.merriam-webster.com (last accessed Jan. 18, 2021) ("distinctive among other examples or cases of the same general category : notably unusual."); "Particular (adjective)," Collins English Dictionary, www.collinsdictionary.com (last accessed Nov. 15, 2019) ("{1} emphasize that you are talking about one thing or one kind of thing rather than other similar ones…{3} emphasize that something is greater or more intense than usual."); *see also Res-Care, Inc. v. United States*, 735 F.3d 1384, 1388 (Fed. Cir. 2013) (affirming reference to dictionary definitions).

experience was distinct and/or how the interplay with other factors could satisfy a less rigid

understanding of particular).  Further remand is required so that Commerce can provide a

redetermination supported by substantial evidence and in accordance with law.

### 2.   *NEXTEEL* Rejected the USCIT's "Temporal Problem" Analysis

Commerce, as the agency in charge of administering the antidumping statute, is obligated

to weigh the whole record before it and find facts in the first instance.  *See* 19 U.S.C. §

1677b(a)(4), (e) (placing the burden of evaluating the evidence upon the "administering

authority," *i.e.*, Commerce); *Atl. Sugar*, 744 F.2d at 1562 (substantial evidence must "tak{e} into

account the entire record, including whatever fairly detracts from the substantiality of the

evidence.").  On remand, Commerce concluded that the *Remand Order* had severely limited

Commerce's ability to do so by "impos{ing} a strict contemporaneity requirement with respect

to distortion based on subsidization and government restructuring that completely discounts pre-

and post-POR evidence."  *Remand Results* at 14.  Commerce concluded that an identical

standard existed with respect to its analysis of strategic alliances.  *See id.* at 19-20.  Thus,

Commerce "discounted all non-contemporaneous evidence as suffering from a temporal

problem."  *Id.* at 17 (discussing subsidization); *see also id.* at 20 (discussing strategic alliances);

*id.* at 24 (discussing government restructuring).  Commerce's expansive construction of the

*Remand Order* as eliminating all record evidence not strictly contemporaneous with the POR

from consideration is inconsistent with *NEXTEEL*, as well as the USCIT's statutory standard of

review, which permits reasonable, evidence-based inferences (including those with a temporal

aspect) to constitute substantial evidence.  *See, e.g.*, *Coal. of Am. Flange Prods. v. United States*,

2021 Ct. Intl. Trade LEXIS 58 at *16 (Ct. Int'l Trade May 13, 2021) ("the court defers to

Commerce's reasonable inference that Chandan was familiar with the behavior of its customer in

light of the negotiation history"); *Vicentin S.A.I.C. v. United States*, 466 F. Supp. 3d 1227, 1242

14

(Ct. Int'l Trade 2020) ("Commerce draws reasonable inferences from the information available explaining that spot prices demonstrate what buyers must pay…."). Having incorrectly deemed swathes of the record unworthy of consideration, Commerce's *Remand Results* are unsupported by substantial evidence.

As an initial matter, *NEXTEEL* does not "affirm" *any* of the USCIT's conclusions with respect to any individual distortion at issue. Instead, the Federal Circuit undertook its own analysis, and concluded based on this "modified reasoning" that several distortions are unsupported by substantial evidence. Notably, the *Remand Order*'s repeated references to "temporal problems," *see Remand Order* at 20-22, 31, an analytical framework drawn from the very USCIT opinion vacated by *NEXTEEL*, *see NEXTEEL Co., Ltd. v. United States*, 450 F. Supp. 3d 1333, 1339-40, 1343 (Ct. Int'l Trade 2020) ("*NEXTEEL AR2 II USCIT*"), appears nowhere in the Federal Circuit's analysis. *NEXTEEL*'s "affirmance" is limited solely to the USCIT's overall conclusion that Commerce's bottom-line finding—*i.e.*, the presence of "all five factors" and their "interaction…with one another" constituted a PMS—was unsupported by substantial evidence. *See NEXTEEL* at 15-16.

Relevant here, *NEXTEEL*'s analysis of pre- and post-POR evidence was far more forgiving than the underlying USCIT opinion had been. *Compare NEXTEEL AR2 II USCIT*, 450 F. Supp. 3d at 1339-40 (concluding that the existence of high pre-POR subsidy rates was insufficient to support a PMS finding because low subsidy rates had been found during the latter part of the POR), *with NEXTEEL* at 11 & n.3 (reviewing the same competing sources, noting a third source that also evidenced POR subsidization, concluding that the evidence "is at best mixed," but finding a lack of substantial evidence due to the absence of other, separate findings). *Compare NEXTEEL AR2 II USCIT*, 450 F. Supp. 3d at 1342 (discounting Commerce's evidence

as "outdated"), *with NEXTEEL* at 12-13 (concluding that substantial evidence was lacking based

on the absence of a sufficient connection to the respondents or the "Korean HRC market as a

whole," without reference to any temporal issue).  The Federal Circuit's rationale most

resembled that of the USCIT when assessing the restructuring factor, but here again *NEXTEEL*'s

stance is more measured.  The USCIT had flatly stated, "{t}here is no record evidence here of

any actual restructuring, nor evidence of government interference," and went even further to

preclude Commerce from concluding that the conditions which led to restructuring were present

during the POR.  *NEXTEEL AR2 II USCIT*, 450 F. Supp. 3d at 1343.  By contrast, *NEXTEEL*

limited its assessment to "government-led restructuring" (without commenting upon evidence of

market distortions that prompted such restructuring) and simply concluded that "publications

discussing future restructuring efforts provide no evidence of actual government interference

during the period of review."  *See NEXTEEL* at 13.

Finally, and dispositive here, the Federal Circuit characterized a strict contemporaneity

requirement as impermissible re-weighing of the evidence.  In vacating the USCIT's judgment,

the Federal Circuit stated:

> The {USCIT} reversed Commerce **based on {the USCIT'}s
> weighing of the evidence, e.g., discounting evidence that
> predated the period of review**, and not because the record supports
> only one outcome. Indeed, in view of the conflicting evidence
> discussed above, the record evidence does not appear to support the
> *absence* of a particular market situation any more than it supports
> the existence of one….The court exceeded its authority by directing
> Commerce to reach a particular outcome.  On remand, Commerce
> may seek to justify the particular market situation in accordance
> with this opinion.

*NEXTEEL* at 16-17 (first emphasis supplied) (internal citations omitted).  Here, Commerce

labored under the impression that exactly such a restriction had been imposed on its remand

proceedings.  For example, this led Commerce to completely disregard evidence identified by

U. S. Steel concerning government restructuring/subsidization support to POSCO, a supplier of HRC to SeAH, shortly before the POR.  *See Remand Results* at 24 (discussing evidence); PMS Allegation at Exs. 87-88 (C.R. 201) (discussing restructuring); SeAH Initial Section D Questionnaire Response at 8 (C.R. 56) (identifying POSCO as HRC supplier during the review period). Consequently, although Commerce "disagree{d}" with the *Remand Order*'s approach, Commerce found it could not "reverse the Court" and thus found neither of these factors contributed to a PMS in Korea.  *Id.*

Moreover, to the extent the *Remand Order* itself discounted evidence, *e.g.*, concerning strategic alliances, merely because it "occurred before the OCTG IV period of review" or "prior to 2017," *see Remand Order* at 27-28, *NEXTEEL* confirms Commerce's discretion to rely on this evidence*, see Remand Results* at 20 (reiterating the relevance of pre-POR evidence of strategic alliances given their longstanding persistence, clandestine nature, and the repeated involvement of both mandatory respondents).  However, Commerce's deference to the Court's unlawful temporal line-drawing led Commerce to ignore the contribution of strategic alliances to the PMS on remand.  *See Remand Results* at 20.  Further remand is thus necessary for Commerce to analyze the entirety of the record evidence and render new PMS findings, without imposing artificial cutoff dates for when evidence may be considered relevant.

### 3.   Commerce May Have Misunderstood the *Remand Order*, But Because the Restrictions in Question Are Proscribed, it Is Not Necessary to Reach this Issue

U. S. Steel does not necessarily agree that Commerce correctly understood the *Remand Order* to impose the extreme restrictions discussed *supra*, but by proscribing those restrictions, *NEXTEEL* has rendered it unnecessary to parse the correctness of Commerce's understanding. Put differently, whether or not Commerce correctly understood these restrictions to exist, the restrictions under which Commerce labored on remand are unlawful.  Nevertheless, were the

Court to consider such restrictions theoretically permissible under *NEXTEEL*, then the Court should alternatively order further remand on the grounds that Commerce's construction of the *Remand Order* was inaccurate, *i.e.*, the *Remand Order* did not in fact impose the extreme, bright-line restrictions that Commerce assumed.

### C.   Commerce's Construction of the Court's *Remand Order* Affected Commerce's Analysis of Four PMS Factors; Insofar as the Court May Not Supplant Commerce as Decision-Maker, Further Remand Is Required

On their face, the broad terms of the Court's remand for "further expla{nation} or reconsider{ation}," *see Remand Order* at 51, did not usurp Commerce's lawful authority to make findings of fact in the first instance, *see, e.g.*, *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 544, (1978) ("while a court may have occasion to remand an agency decision because of the inadequacy of the record, the agency should normally be allowed to exercise its administrative discretion in deciding how…it may best proceed to develop the needed evidence and how its prior decision should be modified in light of such evidence as develops.") (internal quotation marks omitted); *Kearns*, 32 F.3d at 1548 ("Substantial evidence" review does not permit the parties to retry factual issues *de novo* before the reviewing court). Indeed, in response to U. S. Steel's comments, Commerce's *Remand Results* generally set forth findings of fact that Commerce believes would establish the existence of a PMS.

Ultimately, however, Commerce explained that it considered itself legally precluded from concluding that a PMS exists because of the legal significance (or lack thereof) ascribed by the *Remand Order* to *other* findings of fact. But, as the Federal Circuit recently reaffirmed, it is not the USCIT's place to circumscribe Commerce's analysis on remand "based on {the court}'s weighing of the evidence." *See NEXTEEL* at 16. Rather, the remand process must be "open-ended" and is "'simply…for further consideration consistent with {the USCIT's} decision,'"

including any "'new findings and explanations.'" *NEXTEEL* at 16 (first quoting *Ad Hoc Shrimp Trade Action Comm. v. United States*, 515 F.3d 1372, 1383 (Fed. Cir. 2008)) (second quoting *Nippon Steel Corp. v. Int'l Trade Comm'n*, 345 F.3d 1379, 1380–82 (Fed. Cir. 2003)).[7] Commerce erred in understanding the *Remand Order* to limit Commerce's ability to find facts based on record evidence identified by U. S. Steel on remand that had not previously been evaluated by the Court, and to preclude Commerce from addressing straightforward errors of fact in the *Remand Order*.

This Court has regularly ordered further remand where Commerce misconstrues the Court's remand order as preventing Commerce from broadly reanalyzing the record on remand. For example, in *Union Camp Corp. v. United States*, 53 F. Supp. 2d 1310 (Ct. Int'l Trade 1999), the Court remanded Commerce's redetermination for having improperly limited its review of the record, stating:

> Commerce…chose to view the Court's use of the word "cost" {in the remand order} in a restrictive manner, and concluded that the Court's use of this term limited its ability to consider market prices on remand. In so doing, Commerce rendered the Remand Order legally erroneous, since its interpretation led the Remand Order to directly conflict with, and limit, Commerce's statutory discretion to consider prices.

*Id.* at 1319; *see also Changzhou Trina Solar Energy Co. v. United States*, 466 F. Supp. 3d 1287, 1301 (Ct. Int'l Trade 2020) (dismissing arguments that sought to narrow the Court's remand order and stating that the Court's broad remand was "{c}onsistent with the normal preference of the Federal Circuit"); *Jinxiang Hejia Co. v. United States*, 35 C.I.T. 1190, 1196 (2011) ("the

---

[7] *NEXTEEL* noted the existence of a futility exception, but found it did not apply. *See NEXTEEL* at 16. Insofar as the factual record in this administrative review is at least as robust as that considered by the Federal Circuit in *NEXTEEL*, it follows *a fortiori* that the futility exception is likewise irrelevant here.

19

court will not interpret the order as having limited Commerce's ability to reach an accurate determination on remand.").

So, too, does Commerce's impermissibly restrictive interpretation of the Court's *Remand Order* in this instance render the *Remand Results* "legally erroneous."  Despite the Court having remanded for "further expla{nation} or reconsider{ation}," *see Remand Order* at 51, Commerce erroneously treated the Court's observations with respect to Commerce's Final IDM as having locked Commerce into those specific positions on remand.  Such issues distorted Commerce's analysis of the contribution of HRC imports, subsidization, government restructuring, and electricity market control to the Korean PMS.  Remand is thus necessary with respect to the following three issue areas.

### 1. HRC Imports: Commerce Incorrectly Preempted the Court's Substantial Evidence Review

Even accepting, *arguendo*, the two "particularity" restrictions under which the *Remand Results* labored, *see* Section II.B.1, *supra*, Commerce unlawfully stepped into the Court's shoes by refusing to make findings based on Commerce's assumption as to how the Court would address new evidence and arguments.[8]  The Court acknowledged that Korea was China's second-largest HRC export market in 2017 and 2018, by volume, and found this alone insufficient.  *See Remand Order* at 24.  However, U. S. Steel brought several *additional* facts to Commerce's attention on remand that had not been addressed in the *Remand Order*.  *See* USS Draft Remand Comments at 14-15 (C.R.R. 5).

---

[8] If the Court concurs that the restrictive "particularity" definition set forth in the *Remand Results* is unlawful, it need not reach the issue described in this subsection, as Commerce will need to address the evidence in a more fulsome fashion on a further remand.

Specifically, the *average unit value* of HRC imported from China into Korea was in the bottom 15 percent of all 160 Chinese export destinations in 2017 and 2018. PMS Allegation at 16 & n.58 (C.R. 195); *see also id.* at Exs. 37 & 54 (C.R. 197-198). In addition, unlike other countries that imposed trade restrictions to dampen the distortive impact of Chinese HRC imports, the Korean government did nothing. As the Korean Iron and Steel Association ("KOSA") observed in October 2018: "{I}t is difficult for the Korean government to take actions such as imposing antidumping duties or initiating a safeguard…as the Korean government's sanction on Chinese products may ignite a friction between Korea and China in terms of politics and diplomacy and lead the Chinese government to retaliate against Korean steelmakers that have moved into China." PMS Allegation at Ex. 36 (C.R. 197). The political dynamic of the Korean-Chinese relationship further particularizes the ability of Chinese HRC to impact the Korean market, unabated. Internally, moreover, the record indicates that Korean steel cartels adjusted their prices in response to oversupply-related price depressions. *See* PMS Allegation at Ex. 101 at 1 ("due to the increased amount of iron bar import from China…It was necessary to prevent steel manufacturers from fiercely competing on prices by applying significant discount rates from the standard price…") (C.R. 203); *id.* at Ex. 105 ("the six steel makers colluded on setting discount rates on steel bar prices to prevent a steep fall in prices against the flood of cheap Chinese imports…") (C.R. 203), a reaction to distortive Chinese steel imports that also particularizes the Korean market. As U. S. Steel observed, even if the Court did not find volume alone to evidence particularity, there is no record evidence of any other market on earth with the foregoing combination of high volumes of especially low-priced Chinese HRC lacking any government-imposed remedial measures and triggering domestic price fixing. *See* USS Draft Remand Comments at 15 (C.R.R. 5).

21

Commerce's *Remand Results* merely acknowledged the foregoing new evidence, but never engaged with the record.  Rather, Commerce concluded that "the Court's reasoning that effects of Chinese steel imports are insufficient to establish the existence of a PMS in Korea because the effects of global overcapacity are world-wide" precluded this factor from contributing to a PMS finding.  *Remand Results* at 18-19.  It was not that *Commerce* did not consider this sufficient to evidence a PMS; rather, Commerce felt that it "ha{d} no choice but to find that this additional evidence is insufficient to establish the PMS in Korea that can be sustained by the Court."  *Id.* at 19.  Commerce has prejudged the Court's disposition.  Further remand is necessary for Commerce to issue a redetermination setting forth a fulsome rationale based on the complete record to permit evaluation by the Court.

> **2.  Subsidization and Government Restructuring:  Commerce Conflated Distinct Pieces of Evidence and Uncritically Adopted Errors from the *Remand Order***

Because the PMS in question relates to the cost of OCTG production, any distortion (including subsidization or government market interference) that affects "the cost of materials and fabrication or other processing of any kind" used to produce OCTG could contribute to the PMS.  *See* 19 U.S.C. § 1677b(e).  Importantly, as Commerce has recognized, this is not limited to the *direct* subsidization of OCTG producers.  *See, e.g.*, Final IDM at 31-33 (concerning subsidies of HRC production).  Nevertheless, the *Remand Order* phrases several of its key conclusions in precisely those terms.  *See, e.g.*, *Remand Order* at 21 ("None of the record documents cited by Commerce show that *Korean OCTG producers* received subsidies or participated in subsidy programs during the period of review") (emphasis supplied); *id.* at 30 ("the record does not support Commerce's determination that *Korean OCTG producers* took advantage of or received benefits from restructuring programs during the period of review").

This imprecision led to erroneous reasoning in the *Remand Results*.  Commerce recited the Court's precise finding that "none of the evidence cited by Commerce showed that *OCTG producers* had availed themselves of subsidies during the POR," and declining to find subsidization due to the absence of "evidence that directly demonstrates *OCTG producers* took advantage of subsidies during the POR."  *Remand Results* at 17 (emphasis supplied).  This narrow focus on direct subsidization of OCTG producers stopped Commerce from finding a PMS based on a significant piece of evidence that U. S. Steel identified as not yet having been considered by the Court:  POSCO, Korea's largest HRC producer, received restructuring assistance to upgrade a large blast furnace in the first half of 2017, just months prior to the beginning of the POR.  This directly implicates the cost of HRC — the key input used to make OCTG — *during* the POR, insofar as the blast furnace was then operational and POSCO supplied HRC to SeAH during the POR.  *See* PMS Allegation at Exs. 87-88 (C.R. 201); SeAH Initial Section D Questionnaire Response at 8 ("SeAH Steel purchased…carbon-steel hot-rolled coils used in the production of OCTG during the review period from POSCO.") (C.R. 56). Indeed, Commerce found that this "would result in the effects of this restructuring being present during the POR," but construed the *Remand Order* so as to preclude such a finding because it concerned an OCTG input rather than OCTG itself.  *See Remand Results* at 24.  This was error. Because the cost-based PMS provision concerns "the cost of materials and fabrication or other processing of any kind" used to produce OCTG, *see* 19 U.S.C. § 1677b(e), restructuring assistance that bore fruit for SeAH's own HRC supplier during the POR most certainly supports a PMS.

As a final matter, when evaluating the evidence of restructuring-related distortion, Commerce's findings with respect to Hyundai's experience were erroneous.  *See Remand Results*

23

at 24.  Commerce quoted one particular passage from the *Remand Order*:  "the record does not

indicate that Hyundai Steel actually took advantage of restructuring efforts during the period of

review, and Hyundai Steel asserts that it did not take advantage of restructuring efforts."  *Id.*

(quoting *Remand Order* at 21).  But this observation is unsupported by factual information on the

record.  *See* 19 C.F.R. § 351.102(b)(21) (defining "factual information").  For support, the

*Remand Order* credited Hyundai's assertion *in its administrative case brief* that Hyundai "did

not take advantage of restructuring efforts" as conclusive evidence to that effect.  *See Remand*

*Order* at 31 (citing Hyundai Case Br. at 54 (C.R. 335)).  This is a clear violation of the line that

separates record *evidence* from unsupported attorney *argument*, *e.g.*, *Icon Health & Fitness, Inc.*

*v. Strava, Inc.*, 849 F.3d 1034, 1043 (Fed. Cir. 2017) ("Attorney argument is not evidence."),

Commerce's regulatory deadline requiring that factual information be submitted—at the latest—

30 days prior to case briefs, *see* 19 C.F.R. § 351.301(c)(5); and U. S. Steel's right to submit

rebuttal factual information in response, *see* 19 C.F.R. § 351.301(c)(5)(ii).  And while Hyundai's

administrative case brief cites the results of the CY2016 and CY2017 countervailing duty

reviews of cut-to-length plate from Korea, *neither* addresses Hyundai's use of the One Shot Act.

*Compare* Hyundai Case Br. at 54 n.132 (C.R. 335), *with Certain Cut-to-Length Carbon-Quality*

*Steel Plate Products from Korea*, 83 Fed. Reg. 32,840 (July 16, 2018), IDM at 6 (noting only

that Dongkuk Steel Mill Co., Ltd. was approved under the act, which is also known as the

"Special Act on Corporation Revitalization"); *Certain Cut-to-Length Carbon-Quality Steel Plate*

*Products from Korea*, 84 Fed. Reg. 42,893 (Aug. 19, 2019), IDM at 6-7 (same).[9]  These offer no

factual information whatsoever with respect to *Hyundai's* use or non-use, and any conclusion

_____

[9] For the avoidance of doubt, though published after the Final IDM here, the final results of the
CY2018 administrative review exhibit the same defect.  *See Certain Cut-to-Length Carbon-*
*Quality Steel Plate Products from Korea*, 85 Fed. Reg. 84,296 (Dec. 28, 2020), IDM at 8.

built solely upon Hyundai's case brief is devoid of evidentiary support in the record.  The *only* factual evidence on the record establishes that Hyundai was approved for a substantial restructuring benefit, *see, e.g.*, PMS Allegation at Ex. 81 (C.R. 201), and no factual information on the administrative record calls the disposition of that benefit into question.

As such, Commerce's *Remand Results* erred by ignoring relevant record evidence and in adopting conclusions of fact unsupported by any substantial record evidence.

### 3.    Electricity:  The Court Cannot Find Facts *De Novo*; Commerce Unlawfully Treated *Dicta* as Binding Precedent in Evaluating Electricity Market Distortions

The *Remand Order* appears to acknowledge that a PMS could exist, *inter alia*, wherever "prices {are} not being competitively set."  *See Remand Order* at 30.  Commerce insists that its PMS analysis (both in its Final IDM and on remand) has focused on assessing whether this condition has been satisfied.  *See Remand Results* at 22.  This analysis was short-circuited, however, by what Commerce understood to be binding fact-finding by the Court.  *See id.* at 14-15.  Commerce reasoned that if it were to conclude that Korean electricity prices were "not competitively set," Commerce would have to "reverse the Court," which Commerce felt it could not do.  *See id.* at 15.  Commerce's approach is flawed, as it treats language that is plainly nonbinding *dicta* as a binding legal restraint.

The passage in question—the Court's statement that "KEPCO reported an operating loss due to increased environmental and renewable energy costs, decreased electricity demand due to warmer winter weather, and higher natural gas prices"—cannot lawfully be understood as a binding finding of fact.  *See Remand Order* at 29. "It is not for this court on appeal to re-weigh the evidence or to reconsider questions of fact anew." *Trent Tube Div., Crucible Materials Corp. v. Avesta Sandvik Tube AB*, 975 F.2d 807, 815 (Fed. Cir. 1992); *see also Norgren Inc. v. Int'l Trade Comm'n*, 699 F.3d 1317, 1326 (Fed. Cir. 2012) ("The responsibility of this court is not to

re-weigh *de novo* the evidence on close factual questions; it is to review the decision of the {agency} for substantial evidence."). And as Commerce made plain on remand, "Commerce did not make these factual findings." *Remand Results* at 14. Commerce erred, however, by treating the USCIT's *sua sponte* factual findings as binding Commerce's analysis of the record and precluding the existence of a PMS on remand. *See id.* at 14, 22-23.

Separately, even if one were to accept the *Remand Order*'s *sua sponte* factual analysis as binding, Commerce failed to adequately engage with the record evidence brought to its attention during remand. That the Court evidently perceived certain explanations for KEPCO's rising costs does not *ipso facto* dictate that lossmaking prices are being "competitively set." Loss (or profit) is equally a function of cost and price. Regardless of what may be driving KEPCO's costs, it does not cure for the Korean government's failure to approve an economic pricing model for sales of electricity—a failure that led to KEPCO's massive losses. To summarize, U. S. Steel identified *additional* findings of fact supported by the record that would make the facts found *sua sponte* by the USCIT immaterial. Commerce *agreed*, finding that "evidence exists on the record that demonstrates that electricity prices are not competitively set." *See id.* at 22. Yet, Commerce concluded that "the CIT holding with respect to electricity" bound Commerce to a negative PMS finding. *See Remand Results* at 22-23. This is incoherent, insofar as it contravenes Commerce's own weighing of the evidence; and it is furthermore inaccurate, insofar as nothing about the Court's "holding" necessarily precluded a positive PMS finding with respect to electricity. *See Remand Order* at 30 (holding that "Commerce's determination" with respect to electricity as set forth in the Final IDM was "not supported by substantial evidence"). Commerce's conclusion is unsupported by substantial evidence and not in accordance with law.

Finally, Commerce incorrectly treated evidence newly discussed on remand as if it were precluded by the Court's analysis in the *Remand Order*.  Commerce acknowledged evidence that "{n}o cross-sector {electricity} tariff increase has been implemented since November 2013," *Remand Results* at 15 (quoting PMS Allegation at Ex. 121 p.84 (C.R. 204)).  Commerce further acknowledged "statements from KEPCO's CEO" demonstrating government-distorted pricing. *Id.* at 22.  These included the CEO's admission "that while {electricity} demand was high **the cost of materials to produce electricity was higher than the charge to customers**" because KEPCO "has not been able to raise electric charges {to cover increasing input costs} **because it needs to get approval from the government**" and the government was furthermore "postpone{ing} raising industrial electricity prices in order to help the public….,"  Letter from U. S. Steel, "Factual Information to Clarify Aspects of Domestic Interested Parties' Particular Market Situation Allegation" (Sept. 13, 2019) ("PMS Clarifying NFI") at Ex. 52 (P.R. 241) (emphasis supplied).  Similarly, when discussing data for 2017—*i.e.*, during the POR— KEPCO's CEO suggested "the government raise nighttime industrial electricity prices to improve energy consumption patterns of local companies," pointing out "that some major manufacturers excessively operate their plants at night to take advantage of the cheap energy costs," and describing the current system as "*severely distorted*."  PMS Clarifying NFI at Ex. 50 (P.R. 241) (emphasis supplied).

Commerce discounted this evidence not because of any reasoned decision-making or weighing of the evidence, which would have at least provided a decision for the Court to evaluate.  Instead, Commerce found such evidence precluded by the *Remand Order*, reasoning that the Court had previously examined "similar quotations from KEPCO's Form 20-F and several new{s} articles."  *Remand Results* at 22.  But the Court never considered these reports,

which were even more squarely focused on the POR, or addressed the impressions of KEPCO's CEO. *Compare Remand Order* at 29 (citing PMS Allegation at Exs. 217-219 (C.R. 225)), *with* PMS Clarifying NFI at Exs. 50, 52 (P.R. 241).   Nor was it reasonable for Commerce to assume that the Court's three-sentence discussion of KEPCO's 420-page Form 20-F, *compare Remand Order* at 29-30, *with* PMS Allegation at Ex. 121 (C.R. 204), precluded further observations based on that document that were not previously expressed in Commerce's Final IDM.  To that end, in addition to the quotation concerning the lack of cross-sector price increases noted *supra*, U. S. Steel identified evidence demonstrating that the Korean Government also distorts KEPCO's costs by, *e.g.*, setting the price for the million tons of thermal coal that KEPCO sold to its electricity generating subsidiaries, *see* PMS Allegation at Ex. 121 p.51 (C.R. 204), and subsidizing KEPCO's renewable energy operations, *see* PMS Allegation at Ex. 121 p.12 (C.R. 204).  *See* USS Draft Remand Comments at 12 (C.R.R. 5).  Nothing of this sort was addressed in the Court's *Remand Order* and remand is necessary for Commerce to consider this evidence. *See* 19 U.S.C. § 1677b(a)(4), (e) (placing the burden of evaluating the evidence upon the "administering authority," *i.e.*, Commerce); *Atl. Sugar*, 744 F.2d at 1562 (substantial evidence must "tak{e} into account the entire record, including whatever fairly detracts from the substantiality of the evidence.").

## III.    CONCLUSION

Despite repeatedly expressing its inclination to find a particular market situation anew, Commerce understood the *Remand Order* to restrict Commerce's remand analysis in ways that have been repudiated by *NEXTEEL*, contravene the USCIT's standard of review, or were otherwise illogical and unsupported by the administrative record.  Commerce's PMS determination on remand, therefore, is unlawful and unsupported by substantial evidence for failure to consider the entire record.  Accordingly, the Court should order a further remand, so that Commerce may fully assess the existence of a PMS, unburdened by the legal and evidentiary strictures that drove Commerce's reversal under protest during the first remand.

Respectfully submitted,

/s/ Thomas M. Beline
Thomas M. Beline
Myles S. Getlan
James E. Ransdell
*Counsel to United States Steel Corporation*

Date:   March 21, 2022

## Certificate of Compliance

The undersigned hereby certifies that the forgoing submission of "United States Steel Corporation's Comments in Opposition to Remand Redetermination," filed on March 21, 2022, contains 8,841 words, including footnotes, and excluding the table of contents, table of authorities, and signature block, and therefore, complies with the maximum 10,000 word count limitation set forth in rule 2(B)(1) of the Standard Chambers Procedures of the U.S. Court of International Trade.

BY: /s/ James E. Ransdell

James E. Ransdell